**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

VIRGINIA HISTORIC TAX CREDIT
FUND 2001 LP; VIRGINIA HISTORIC
TAX CREDIT FUND 2001 LLC; TAX
MATTERS PARTNER,

        *Petitioners-Appellees,*

v.

COMMISSIONER OF INTERNAL
REVENUE,

        *Respondent-Appellant.*

No. 10-1333

COMMONWEALTH OF VIRGINIA,

    *Amicus Supporting Appellees.*

VIRGINIA HISTORIC TAX CREDIT
FUND 2001 LLC; VIRGINIA
HISTORIC TAX CREDIT FUND 2001
SCP, LLC; TAX MATTERS PARTNER,

*Petitioners-Appellees,*

v.

COMMISSIONER OF INTERNAL
REVENUE,

*Respondent-Appellant.*

No. 10-1334

COMMONWEALTH OF VIRGINIA,

*Amicus Supporting Appellees.*

VIRGINIA HISTORIC TAX CREDIT
FUND 2001 LLC; VIRGINIA
HISTORIC TAX CREDIT FUND 2001
SCP, LP; TAX MATTERS PARTNER,

*Petitioners-Appellees,*

v.

COMMISSIONER OF INTERNAL
REVENUE,

*Respondent-Appellant.*

No. 10-1336

COMMONWEALTH OF VIRGINIA,

*Amicus Supporting Appellees.*

Appeals from the United States Tax Court.
(Tax Ct. Nos. 716-08; 870-08; 871-08)

Argued: January 25, 2011

Decided: March 29, 2011

Before NIEMEYER, DUNCAN, and KEENAN,
Circuit Judges.

---

Reversed and remanded by published opinion. Judge Duncan
wrote the opinion, in which Judge Niemeyer and Judge Kee-
nan joined.

---

**COUNSEL**

**ARGUED:** Ivan C. Dale, UNITED STATES DEPART-
MENT OF JUSTICE, Washington, D.C., for Appellant.
David Decoursey Aughtry, CHAMBERLAIN, HRDLICKA,
WHITE, WILLIAMS & MARTIN, Atlanta, Georgia, for
Appellees. **ON BRIEF:** John A. DiCicco, Acting Assistant
Attorney General, Richard Farber, Tax Division, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C.,
for Appellant. Hale E. Sheppard, CHAMBERLAIN,
HRDLICKA, WHITE, WILLIAMS & MARTIN, Atlanta,
Georgia, for Appellees. Kenneth T. Cuccinelli, II, Attorney
General of Virginia, E. Duncan Getchell, Jr., State Solicitor
General, Stephen R. McCullough, Senior Appellate Counsel,
Charles E. James, Jr., Chief Deputy Attorney General,
OFFICE OF THE ATTORNEY GENERAL, Richmond, Vir-
ginia, for Amicus Supporting Appellees.

---

**OPINION**

DUNCAN, Circuit Judge:

This appeal presents the question of whether certain trans-
actions between a partnership and its partners amounted to

"sales" for purposes of federal tax law. During an audit, the Commissioner of Internal Revenue (the "Commissioner") challenged the way that Virginia Historic Tax Credit Fund 2001, LLC ("2001 LLC"), as the tax matters partner of Virginia Historic Tax Credit Fund 2001 LP ("2001 LP"), Virginia Historic Tax Credit Fund 2001 SCP, LLC ("SCP LLC") and Virginia Historic Tax Credit Fund 2001, SCP, LP ("SCP LP") (collectively, "the Funds"), reported a series of transactions with investor partners in the Funds' 2001 and 2002 federal tax returns. The United States Tax Court found that the Funds had properly characterized these transactions, and the Commissioner appealed. For the reasons set forth below, we reverse the Tax Court and find that the Commissioner properly treated the challenged transactions as "sales" under I.R.C. § 707.

I.

The facts in this case are not in dispute. Our recitation is drawn primarily from the Tax Court's findings of fact and the parties' stipulations. By way of background, we begin by describing Virginia's Historic Rehabilitation Credit Program (the "Virginia Program"), in which the Funds were designed to participate. We then turn to the details of the Funds and the challenged transactions before summarizing the findings of the Tax Court.

A.

Because the cost of renovating historic property often exceeds the property's market value, many states have enacted legislation designed to encourage investment in this area.[1] Virginia has chosen to provide an incentive to historic developers in the form of tax credits. Under the rules of the Virginia Program, any person rehabilitating a historic prop-

---

[1]There is also federal support for historic rehabilitations in the form of federal tax credits. *See* I.R.C. § 47.

erty can seek state approval and certification of the project by the Virginia Department of Historic Resources ("DHR"). Once the property is certified, its developer is entitled to receive tax credits of up to twenty-five percent of eligible expenses incurred in renovating the property. *See* Va. Code Ann. § 58.1-339.2. These state tax credits can be applied dollar-for-dollar against Virginia income tax liability.

At times, the amount of historic tax credits issued to a historic property developer exceeds the developer's income tax liability. Unlike some other states, Virginia does not allow tax credits to be sold or transferred in this event. Virginia does, however, have a partnership allocation provision that permits state tax credits allocated to a partnership to be divided among the partners "as the partners or shareholders mutually agree."[2] *Id.* This provision is often used by developers to "allocate a disproportionate share of [their] State tax credits to limited partners whose [monetary] contributions then fill the credit gap." *Va. Historic Tax Credit Fund 2001 LP v. C.I.R.*, T.C. Memo 2009-295, 2009 WL 4980488, at *2 (2009).

Although the scheme described above reflects the rules of the Virginia Program both as originally enacted in 1996 and as currently in force, a brief change that occurred in these rules is relevant to the instant appeal. Before Virginia finalized its Program rules, some historic renovation projects began under the assumption that the Program would permit the sale or transfer of credits. To protect projects that had begun under this assumption, Virginia temporarily amended its program in 1999 to allow for a one-time transfer (i.e., sale) of credits for projects that received certification prior to the publication of the Program's final regulations.[3] Such transfers had to be approved by the director of DHR.

---

[2]Virginia also permits credits to be carried over for up to ten years "[i]f the amount of such credit exceeds the taxpayer's tax liability for such taxable year." Va. Code Ann. § 58.1-339.2.

[3]This one-time transfer provision was codified in 1999 legislation amending the original state rehabilitation statute, but was terminated before final Program Regulations were published. The parties do not dispute that the one-time transfers from developers to the Funds that occurred under this temporary provision were valid.

B.

In 2001, Daniel Gecker ("Gecker"), Robert Miller ("Miller"), and George Brower ("Brower") came together to set up the Funds in question. All three had previously been consultants in the design and implementation of the Virginia Program and were familiar with its workings and limitations. One such limitation was that smaller historic renovation projects were still having difficulty obtaining funding. To address this issue, they structured the Funds as partnerships that investors could join by contributing capital. The Funds would use that capital to partner with historic property developers renovating smaller projects, in exchange for state tax credits.

Gecker, Miller, and Brower became principals of the Funds and designated four linked partnership entities as Fund partners. They named 2001 LLC as the Funds' general partner and tax matters partner, and 2001 LP as the "source partnership" that would partner with historic developers. Gecker and Miller each held a 35% interest in the general partner, 2001 LLC, with Miller's interest held through his wholly owned entity BKM, LLC. Brower held the remaining 30% interest. 2001 LLC became, in turn, the 97% owner of 2001 LP. 2001 LLC also became the 99% owner of two pass-through partners, SCP LLC, and SCP LP, which were lower-tier partnerships.[4] SCP LLC and SCP LP were each 1% owners in 2001 LP; the remaining 1% interest in 2001 LP was reserved for sale to investors, as was a 1% interest in SCP LLC and SCP LP.

The Funds began soliciting investors willing to contribute capital to the partnership in exchange for the allocation of state tax credits in late 2001. The precise rates of return offered to investors differed slightly depending on the partnership through which they invested—2001 LP, SCP LLC, or

---

[4]The Tax Court's opinion includes a pictorial representation of the Funds' organization. *See Va. Historic*, 2009 WL 4980488, at *5.

SCP LP—but otherwise the arrangements were the same. Each investor was promised a certain amount of tax credits and a limited partnership interest in the Funds in exchange for a capital contribution to the Funds. The lower-tier partnerships passed their capital contributions on to 2001 LP.

Investors received a confidential offering memorandum (the "offering memo") and partnership agreements that set forth their arrangement with the Funds in detail. For every $.74 - $.80 contributed by an investor, the Fund would provide the investor with $1 in tax credits. If such credits could not be obtained, the partnership agreement promised a refund of capital to the investor, "net of expenses." J.A. 438.

The partnership agreement also explained that each investor (or, in the agreement, "Limited Partner") would be given "a percentage participation in the Partnership equal to one percent (1%) multiplied by a fraction the number [sic] of which is the number of units owned by the Limited Partner and denominator of which is the total number of units outstanding." J.A. 438. In practice, however, this complex formula appears not to have been applied: the subscription agreements signed by the investors indicate that most were simply given a .01% interest in the Funds, irrespective of their capital contributions, although some subscription agreements for SCP LP state that a 1% interest was acquired.[5] These slight discrepancies were of limited importance, however, as the offering memo explained that investors should expect to receive no material amounts of partnership income or loss.

---

[5]As the Commissioner has pointed out, given that hundreds of investors ultimately signed such agreements, the ownership percentages contained in the subscriptions agreements do not add up to a total 1% interest in each Fund being held by investors, as they should. In any event, the precise ownership interest of each investor is unimportant; what is noteworthy is that the Funds were structured so that the investors owned in total only a 1% interest in each Fund.

The partnership agreement and offering memo also addressed the Funds' plan for partnering with developers. The Funds would become a .01% limited partner in selected historic property development partnerships (termed "Operating Partnerships" in the partnership agreement), and would provide capital contributions in exchange for tax credits. However, the Funds promised not to "make a capital contribution in excess of $100 to an Operating Partnership until the General Partner has received certification from the [DHR] that the rehabilitation constitutes a qualified rehabilitation and the amount of qualified rehabilitation expenditures paid or incurred by the Operating Partnership." J.A. 438. In other words, the partnership agreement stated that the Funds would invest only in completed projects, thereby eliminating a significant area of risk. In addition, the Funds' agreements with their Operating Partners provided that the Operating Partners would reimburse the Funds in the event that any of their credits could not be delivered or were later revoked by the state. At least some of these agreements were further backed by guarantors.

The offering memo also explained how the Funds would pay their operating expenses. The Operating Partnerships would "make available to the General Partner a total of $20,000 to pay for the cost of the Partnership's annual accounting expenses and other Partnership operating expenses." J.A. 2073. Should annual expenses be higher than this, the General Partner promised to fund them, explaining that "[a]lthough the General Partner does not have any significant amount of assets, it is not anticipated that the annual operating expenses of the Partnership will be high." *Id.*

Between November 2001 and April 2002, 282 investors signed partnership agreements, subscriptions agreements, and options agreements with the Funds. The source partnership, 2001 LP, obtained 181 investors, while SCP LLC obtained 93 investors and SCP LP obtained eight investors. The subscription agreements specified the dollar amount contributed by

each investor, and stated that this amount was paid in exchange for the allocation of a corresponding number of tax credits "*simultaneously* with Investor's admission." *See, e.g.*, J.A. 2086 (emphasis added). The options agreements gave the Funds the sole option to purchase each partner's interest for fair market value during 2002, and assigned to Gecker a limited power of attorney to execute all documents necessary to effectuate these purchases.

In total, the Funds collected $6.99 million from investors between November 2001 and April 2002. During this same time period, the Fund paid a total of fifteen developers $5.13 million, at a price of $.55/$1 tax credit, to obtain $9.2 million in historic rehabilitation tax credits. Approximately one-third of these tax credits were purchased from developers under Virginia's one-time transfer provision; the rest were obtained in exchange for capital contributions to Operating Partnerships with which the Fund partnered. In April 2002, the Funds distributed to investors "Schedules K-1"[6] designating to each investor his promised amount of tax credits and attaching the DHR Certificates of Rehabilitation from the Funds' Operating Partnerships. J.A. 261-62. However, "[s]pecific credits were not designated as being allocated to any one particular investor . . . ; instead the investors were informed of the amount allocated to them from the pool of credits." J.A. 262. The Funds then exercised their option to buy out all investors in May 2002, paying them each .001 times their contribution for a total buyout cost of approximately $7,000.

## C.

The instant dispute arose from the way the Funds reported this series of transactions in their federal tax filings. In both their 2001 and 2002 Forms 1065, U.S. Return of Partnership

---

[6]"A Schedule K-1 is used as part of the tax return to report the partner's share of income, credits, deductions and other items resulting from the partnership." *Hansen v. C.I.R.*, 471 F.3d 1021, 1026 n.6 (9th Cir. 2006).

Income, the Funds reported the money paid to Operating Partnerships in exchange for tax credits as partnership expenses and reported the investors' contributions to the Funds as non-taxable contributions to capital. The Funds' returns therefore reflected that the Funds sustained a total of $3.28 million in losses for 2001 and 2002.

The Internal Revenue Service ("IRS") audited the Funds and challenged their characterization of investors' funding as "contributions to capital." Instead, the Commissioner concluded that the investors were not actual partners of the Funds, and that "these investors' capital contributions to the partnership and receipt of the state income tax credits in return was a sale of income tax credits to the investors." J.A. 342. Accordingly, the Commissioner believed that the Funds should have reported the money they received from investors as income.

The IRS issued to the Funds six Final Partnership Administrative Adjustments ("FPAAs"),[7] which reflected its contention that investors' contributions should have been reported as income on the Funds' 2001 and 2002 returns. Based on the numbers provided by the Funds in their tax returns, the Commissioner originally calculated that the Funds should have recognized income in the amount of $4.02 million. The parties have since stipulated that if the Commissioner is correct, the Funds should have reported income of $1.53 million as a result of investor contributions.[8] The parties have also stipu-

---

[7]"[W]hen the IRS disagrees with a partnership's reporting of any partnership item, it must issue a Final Partnership Administrative Adjustment . . . before making any assessments against the partners attributable to such an item." *Marriott Int'l Resorts, L.P. v. United States*, 586 F.3d 962, 964 (Fed. Cir. 2009); *see also* I.R.C. §§ 6223(a)(2), (d)(2), 6225(a).

[8]The parties agreed upon this number through the following calculations: The Funds received from investors $6.99 million in contributions, paid to Developers $5.13 million, and incurred syndication costs and other commissions of $330,986, resulting in a net gain of $1.53 million if the Commissioner prevails in his characterization of the transactions.

lated that although the Commissioner originally challenged both the Funds' 2001 and 2002 returns, if the Commissioner prevails, the gains realized by the Funds will be treated as having occurred in 2002.

D.

The Funds disputed the Commissioner's characterization of their partnership arrangement and timely filed petitions for readjustment of partnership items with the Tax Court pursuant to I.R.C. § 6226(a). At trial, the Commissioner presented two bases for his assertion that the FPAAs were correct: (1) under the substance-over-form doctrine, the investors were not "bona fide" partners in the Funds for federal tax purposes, but instead were mere purchasers; and (2) the transactions between the investors and the partnerships were "disguised sales" under I.R.C. § 707. The Commissioner only needed to establish one basis to prevail.

After trial, the Tax Court issued an opinion rejecting both of the Commissioner's assertions. It first found that the investors were in fact partners for federal tax purposes under the partnership test announced by the Supreme Court in *Commissioner v. Culbertson*, 337 U.S. 733 (1949). The Tax Court reasoned that the partnership agreements, the parties' conduct in their execution, the parties' statements, the testimony of disinterested persons, the relationship of the parties, and the control of income and purposes for which it was used all pointed to a conclusion that the investors and the Funds fully intended to enter into a partnership arrangement.

The Tax Court further found that the substance-over-form doctrine did not dictate that the partnership arrangement between the investors and the Funds was not bona fide. It found that investors' contributions did not reflect merely the purchase price of credits; instead, "the contributions were pooled to facilitate investment in the developer partnerships, to purchase additional credits under the one-time transfer pro-

vision . . . , to cover the expenses of the partnerships, to insure against the risks of the partnerships, and to provide capital for successor entities . . . ." *Va. Historic*, 2009 WL 4980488, at *14. The Tax Court also found that investors bore sufficient risk to make them partners, including the risks that developers might not provide the promised tax credits or that the credits might be revoked. The Tax Court acknowledged that "investors received assurance that their contributions would be refunded" if the tax credits were not received or were revoked, but found this assurance counteracted by the lack of a guarantee "that the resources would remain available in the source partnership to do so." *Id.*

The Tax Court also rejected the Commissioner's argument that the transactions between the investors and the Funds were "disguised sales" under I.R.C. § 707. Section 707(a)(2)(B) allows the Commissioner to treat a transaction that occurs between a partner and his partnership as though it occurred "between the partnership and one who is not a partner" if the partner transfers money to the partnership in exchange for "a related direct or indirect transfer of money or other property by the partnership to such partner," such that the transaction is "properly characterized as a sale or exchange." The Tax Court found that although such transactions are "presumed sales" when they occur within two years of one another, the transactions here were not disguised sales because the transactions were "not simultaneous" and the investors faced "entrepreneurial risks" in the partnership. T.C. Memo 2009-295, at *16. This appeal followed.

## II.

On appeal, the Commissioner makes the same two arguments he made before the Tax Court: that the investors were not bona fide partners of the Funds, and that even if they were, the transactions between the investors and the Funds should nevertheless be classified as sales for federal tax purposes under the relevant Code provisions and regulations.

Assuming, without deciding, that a "bona fide" partnership existed, we nevertheless find that the Commissioner properly recharacterized the transactions at issue as "sales" under I.R.C. § 707.[9]

In the sections that follow, we first set forth the rules and regulations governing the question of when a purported partnership transfer should be reclassified as a sale. Normally, we would then proceed to consider our standard of review and whether the transactions at issue should be reclassified under these rules. However, the Funds make a preliminary argument that their transactions should not be analyzed under these rules because no transfer of "property" occurred between the Funds and their investors. Accordingly, we address this argument before turning to the appropriate standard of review and consideration of the relevant criteria to determine whether a "disguised sale" occurred here.

## A.

A partnership is not itself liable for the payment of income taxes; instead, partnerships operate as "pass-through" entities and each partner must pay taxes on his or her allocated share of the partnership's income or loss.[10] *See* I.R.C. §§ 701, 702;

---

[9]The Department of the Treasury specifically contemplates that its regulations regarding disguised sales can be applied *before* it is determined whether a valid partnership exists. *See* Treas. Reg. § 1.707-3 (1992) ("If a person purports to transfer property to a partnership in a capacity as a partner, the rules of this section apply for purposes of determining whether the property was transferred in a disguised sale, *even if it is determined after the application of the rules of this section that such person is not a partner*." (emphasis added)).

[10]This allocation from the partnership to each partner occurs in accordance with the partnership agreement and is reported on a Schedule K-1. *See* I.R.C. § 704; *Salman Ranch Ltd. v. United States*, 573 F.3d 1362, 1365 n.4 (Fed. Cir. 2009). Each partner's individual taxes must reflect the same allocations that are reported on this schedule. *See Salman Ranch*, 573 F.3d at 1365 n.4.

*Hillman v. I.R.S.*, 250 F.3d 228, 230 (4th Cir. 2001); *see also Salman Ranch Ltd. v. United States*, 573 F.3d 1362, 1365 (Fed. Cir. 2009). "However, each year a partnership must file an information return (IRS Form 1065) reporting items of gross income and allowable deductions." *Salman Ranch*, 573 F.3d at 1365 n.4 (citing I.R.C. § 6031(a)). Items that must be reported include "gains and losses from sales or exchanges of capital assets." I.R.C. § 702. But I.R.C. § 721 provides that "[n]o gain or loss shall be recognized to a partnership or to any of its partners in the case of a contribution of property to the partnership in exchange for an interest in the partnership." Similarly, "[n]o gain or loss shall be recognized to a partnership on a distribution to a partner of property, including money." *Id.* § 731(b). In other words, whereas a partnership must report any proceeds received from the sale of its assets as taxable income, partners' contributions to capital and a partnership's distributions to partners are tax-free.

These rules have been recognized as susceptible to manipulation by persons wishing to shield transactions that are more accurately characterized as sales from their proper tax consequences. *See, e.g.*, *Otey v. C.I.R.*, 70 T.C. 312, 317 (1978); *Campbell v. C.I.R.*, 943 F.2d 815, 822 (8th Cir. 1991); *see also* Staff of Joint Comm. on Tax'n, 98th Cong., 2d Sess., General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 225 (1985) ("Joint Comm. Report") (expressing Congress's concern that "partnerships had been used effectively to circumvent the requirement to capitalize certain expenses"). To guard against this problem, the Tax Code "recognizes that in some cases partners do not deal with a partnership in their capacity as partners." *Otey*, 70 T.C. at 317. Specifically, I.R.C. § 707 "prevents use of the partnership provisions to render nontaxable what would in substance have been a taxable exchange if it had not been 'run through' the partnership." *Id.*

Section 707, as strengthened by Congress in 1984,[11] pro-

---

[11]In the late 1970s, it became apparent that the then-current version of § 707 did not go far enough in allowing the IRS flexibility to reclassify

vides that "[i]f a partner engages in a transaction with a partnership other than in his capacity as a member of such partnership, the transaction shall, except as otherwise provided in this section, be considered as occurring between the partnership and one who is not a partner." I.R.C. § 707(a)(1). Non-partnership-capacity transactions include the situation where:

> (i) there is a direct or indirect transfer of money or other property by a partner to a partnership,

> (ii) there is a related direct or indirect transfer of money or other property by the partnership to such partner (or another partner), and

> (iii) the transfers described in clauses (i) and (ii), when viewed together, are properly characterized as a sale or exchange of property[.]

§ 707(a)(2)(B). Such a transaction, in which a "partner contributes property to a partnership and soon thereafter receives a distribution of money or other consideration from the partnership," is often referred to as a "disguised sale." *Canal Corp. v. C.I.R.*, 135 T.C. No. 9, 2010 WL 3064428, at *8 (Aug. 5, 2010); *see also* Treas. Reg. § 1.707-3.

Treasury Regulations clarify which partnership transfers should be "properly characterized as a sale or exchange of property" under § 707(a)(2). *See* Treas. Reg. § 1.707-3. Section 1.707-3 applies, by its terms, to transfers of property *to* a partnership in exchange for money *from* the partnership—in

---

improperly labeled partnership items. *See* Joint Comm. Report at 225. Congress therefore revised the provision in 1984 by adding to § 707(a) the current detailed provisions regarding when a transaction should be considered to have occurred outside of the partnership capacity. *See* Deficit Reduction Act of 1984, Pub. L. No. 98-369, § 73, 98 Stat. 494, 591 (1984).

other words, the reverse of what occurred here. However, § 1.707-6 specifies:

> Rules similar to those provided in § 1.707-3 apply in determining whether a transfer of property by a partnership to a partner and one or more transfers of money or other consideration by that partner to the partnership are treated as a sale of property, in whole or in part, to the partner.

*Id.* § 1.707-6(a). Accordingly, we look to § 1.707-3 to determine whether the transfers disputed here have the characteristics of a sale.

Section 1.707-3 calls for an evaluation of "all the facts and circumstances" surrounding the transaction to determine whether

> (i) The transfer of money or other consideration would not have been made *but for* the transfer of property; and

> (ii) In cases in which the transfers are not made simultaneously, the subsequent transfer is not dependent on the entrepreneurial risks of partnership operations.

*Id.* § 1.707-3(b)(1) (emphasis added). It goes on to list ten factors, five of which are of particular relevance here, to be taken into consideration:

> (i) That the timing and amount of a subsequent transfer are determinable with reasonable certainty at the time of an earlier transfer;

> (ii) That the transferor has a legally enforceable right to the subsequent transfer;

(iii) That the partner's right to receive the transfer of money or other consideration is secured in any manner, taking into account the period during which it is secured;

. . .

(ix) That the transfer of money or other consideration by the partnership to the partner is disproportionately large in relationship to the partner's general and continuing interest in partnership profits; and

(x) That the partner has no obligation to return or repay the money or other consideration to the partnership, or has such an obligation but it is likely to become due at such a distant point in the future that the present value of that obligation is small in relation to the amount of money or other consideration transferred by the partnership to the partner.

*Id.* § 1.707-3(b)(2).[12]

Significantly here, § 1.707-3 also sets forth a presumption that all transfers "made within two years" of each other are sales, "unless the facts and circumstances clearly establish that the transfers do not constitute a sale." *Id.* § 1.707-3(c). This presumption places a high burden on the partnership to establish the validity of any suspect partnership transfers. *See* Treatment of Transactions Between Partners and Partnerships, 57 Fed. Reg. 44974, 44975 (Sept. 30, 1992) (explaining that this presumption is included in the regulations "to establish which party has the burden of going forward in litigation").

---

[12]The additional factors include consideration of lending obligations, debt obligations, the amount of liquid partnership assets, whether other persons were "legally obligated to make contributions to the partnership in order to permit the partnership to make the transfer," and whether the transactions were structured "to effect an exchange of the burdens and benefits of ownership of property." *See* Treas. Reg. § 1.707-3(b)(2).

B.

The Funds argue that § 707 cannot be applied to recharacterize their transactions with investors because these transactions did not involve an exchange of money for "property."[13] Specifically, they argue that Virginia's historic rehabilitation tax credits are not "property" because they are non-transferable and non-heritable under state law. There was thus, they argue, no "transfer of money or other property" from the Funds to the investors. *See* I.R.C. § 707(a)(2)(B)(ii). Because of its reliance on a finding of entrepreneurial risk, the Tax Court found it unnecessary to reach this issue. *See Va. Historic*, 2009 WL 4980488, at *15 n.14. Finding it necessary to our § 707 analysis, however, we consider it for the first time on appeal.

The Internal Revenue Code does not define "property" as the term is used in § 707, and so we must go beyond the bounds of the statute to determine whether Virginia tax credits count as such. This determination is a hybrid federal and state law question. *See United States v. Craft*, 535 U.S. 274, 278 (2002); *see also Drye v. United States*, 528 U.S. 49, 57 (1999). *Craft* succinctly explained the dual roles of state and federal law in determining whether a particular item or arrangement constitutes property for purposes of federal tax law:

A common idiom describes property as a "bundle of

---

[13]Appellees also argue that because the partners were acting in their capacity as partners, and because credits were "allocated" to partners rather than transferred, there cannot be a § 707 violation here. But this argument is tautological: the test developed in I.R.C. § 707 and Treas. Reg. § 1.707-3 is designed to *evaluate* whether partners are acting in their partnership capacity when "allocating" property. Thus, the only way we can determine whether the Funds and their investors were acting in their capacity as partners during these transactions is to consider the "facts and circumstances" of the transactions as instructed by I.R.C. § 707 and Treas. Reg. § 1.707-3.

> sticks"—a collection of individual rights which, in certain combinations, constitute property. State law determines only which sticks are in a person's bundle. Whether those sticks qualify as "property" for purposes of the federal tax lien statute is a question of federal law.

*Craft*, 535 U.S. at 278-79. Although *Craft* examined the characterization of property for purposes of the federal tax lien statute, I.R.C. § 6321, we believe the same basic analysis adheres in determining whether a particular "bundle of sticks" constitutes property for purposes of I.R.C. § 707.[14]

Accordingly, to determine whether Virginia's historic rehabilitation tax credits are "property" for federal tax purposes, we ask whether they embody "some of the most essential property rights." *Id.* at 283. In particular, the Supreme Court in *Craft* identified the "right to use the property, to receive income produced by it, and to exclude others from it," as fundamental property rights. *Id.* Similarly, in *Drye*, the Supreme Court placed primary emphasis on the "breadth of the control the taxpayer could exercise over the property" and whether the right in question was "valuable." (internal marks and quotations omitted). 528 U.S. at 60-61. *Drye* noted that transferability, although not essential, is also a relevant factor. *See id.* at 60 n.7.

---

[14]Other circuits have extended the *Craft* analysis beyond I.R.C. § 6321. For example, in *In re Greene*, 583 F.3d 614, 620 (9th Cir. 2009), the Ninth Circuit followed the Fifth Circuit in applying this same analysis to determine whether a certain declaration qualified as "'any amount of interest that was acquired' within the compass of Section 522(p)" of the Bankruptcy Code. We recognize that I.R.C. § 6321 has been interpreted as establishing a particularly expansive definition of "property," *see Drye*, 528 U.S. at 56, and that perhaps § 707 is not intended to reach quite so broadly. However, although there might be some variation between the two sections' definitions of property, this variation is not relevant to the instant appeal. On these facts, it is clear that the Funds' exchange of tax credits for money was a transfer of "property" as the term is used in either section.

Applying these factors to the instant case, we find that the transfer of tax credits from the Funds to investors under the circumstances presented here constituted a transfer of "property."[15] It is clear on these facts that the Funds' tax credits were both "valuable" and imbued with "some of the most essential property rights." *See Craft*, 535 U.S. at 283; *Drye*, 528 U.S. at 60. That the Funds' tax credits had pecuniary value is evidenced by the fact that the Funds used the credits to induce investors to contribute money.[16] Additionally, the Funds exercised proprietary control over the tax credits: once the historic developers allocated to the Funds the rights to use or distribute these credits, the Funds could exclude others from utiliz-

---

[15]It bears emphasizing that we are not deciding whether tax credits always constitute "property" in the abstract. Rather, we are asked to decide only whether the transfer of tax credits acquired by a non-developer partnership to investors in exchange for money constituted "a transfer of property" for purposes of § 707. *See Charley v. C.I.R.*, 91 F.3d 72, 74 (9th Cir. 1996) (finding that even though frequent flyer miles may not be "gross income" in the abstract, a taxpayer who arranged what was in essence a "sale" of his miles to his employer was liable for the income received from transferring these miles); *cf. United States v. Griffin*, 324 F.3d 330, 354-55 (5th Cir. 2003) (finding that as-of-yet unissued historic development tax credits were not property when they were in a state agency's possession, even though the tax credits took on property attributes after they were distributed to historic developers).

[16]The Funds point to the Supreme Court's decision in *Randall v. Loftsgarden*, 478 U.S. 647 (1986) to argue the contrary—that these tax credits did not have any value in themselves. *Randall* is readily distinguishable, however, because it considered whether the receipt of tax credits was itself the receipt of "income," finding quite logically that it was not, as it would defeat the purpose of a tax credit if the credit had to be reported as income before it could be used to offset income. *See id.* at 657 ("Unlike payments in cash or property received by virtue of ownership of a security . . . the 'receipt' of tax deductions or credits is not itself a taxable event, for the investor has received no money or other 'income' within the meaning of the Internal Revenue Code."). As we have explained, we are not asked in this case to decide whether tax credits *in general* constitute "property" or "income." Instead, we are asked only to determine whether a party's decision to exchange its tax credits for money, rather than utilize them, means that the "payment in cash" the party receives should be categorized as "income."

ing the credits and were free to keep or pass along the credits to partners as they saw fit.

As for the tax credits' transferability, although Virginia law prohibits historic tax credits from being bought and sold directly, this is a nominal prohibition. As the facts here illustrate, it is a relatively simple matter in Virginia to effectuate a third-party transfer by forming a partnership with an interested buyer who is then "allocated" the credits in exchange for a contribution to the partnership. To hold that these tax credits, which the Funds undeniably gave to investors in exchange for money, are not property simply because they could not be directly bought and sold would elevate form over substance in precisely the manner we are advised to guard against. *See Craft*, 535 U.S. at 279 ("In looking to state law, we must be careful to consider the substance of the rights state law provides, not merely the labels the State gives these rights or the conclusions it draws from them.").

Furthermore, including the exchange of tax credits for dollars within the scope of § 707 "property" comports with Congress's intent to widen the provision's reach in 1984. Congress strengthened § 707 specifically because of concern "that taxpayers ha[d] deferred or avoided tax on sales of property" and that courts were allowing "tax-free treatment in cases which were economically indistinguishable from sales . . . ." H.R. Rep. No. 98-861, at 860 (1984) (Conf. Rep.); *see also United States v. G-I Holdings Inc.*, No. 02-3082, 2009 WL 4911953, at *19 (D.N.J. Dec. 14, 2009) (explaining that the "well-known" intent of Congress in enacting § 707(a)(2)(B) was to "instruct[ ] courts to question more stringently" those "transactions in which a partnership contribution was followed by a partnership distribution"). To combat this problem, the Department of the Treasury was instructed to promulgate new regulations, which allow for a flexible evaluation of "all the facts and circumstances" in determining whether any particular transaction should be treated as a sale. Joint Comm'n Report at 231; *see also* I.R.C.

§ 707(a)(2); Treas. Reg. § 1.707-3(b)(1). This Congressional and regulatory treatment strengthens our conclusion that a transfer of tax credits in exchange for money qualifies as a transfer of "property" on the facts before us.

## C.

### (i)

Having found that the Funds' exchange of tax credits for investor contributions included the transfer of "property" from the Funds to investors for purposes of § 707(a)(2)(B), we turn to the question of whether these transfers should be properly recharacterized as "sales" under that provision and the factors enumerated in Treasury Regulation § 1.707-3. However, before addressing the particulars of the transactions at issue, we must determine the level of deference we owe to the Tax Court's holding that these transactions did not meet the disguised sale criteria of I.R.C. § 707 or Treas. Reg. § 1.707-3.

The Tax Court's holding relied largely on its factual findings, which we review for clear error. *See McHan v. C.I.R.*, 558 F.3d 326, 331 (4th Cir. 2009). However, the ultimate issue of whether a transaction is properly characterized as a "sale" is legal in nature. *See Frank Lyon Co. v. United States*, 435 U.S. 561, 581 n.16 (1978) ("The general characterization of a transaction for tax purposes is a question of law subject to review. The particular facts from which the characterization is to be made are not so subject."); *Am. Realty Trust v. United States*, 498 F.2d 1194, 1198-99 (4th Cir. 1974) (concluding, when evaluating the federal tax treatment of a sale-and-lease-back transaction, that "the determination of the bona fides of [the] transaction involves, ultimately, a legal conclusion, albeit one grounded in underlying findings of fact."). Accordingly, we will review the Tax Court's factual findings for clear error, but will review de novo its legal conclusion that the transfers here did not constitute a "sale."

(ii)

We begin, as Treasury Regulation § 1.707-3 requires, with a presumption that the Funds' exchange of tax credits for investor contributions was a sale because the transfers undisputedly occurred well within two years of one another. *See* Treas. Reg. § 1.707-3(c). This presumption can be overcome only if we determine that the facts as found by the Tax Court "clearly establish[ed] that the transfers do not constitute a sale." *Id.* We consider those facts in light of the factors enumerated in § 1.707-3(b).

Treasury Regulation § 1.707-3(b)(2) first instructs us to consider whether "the timing and amount of a subsequent transfer [were] determinable with reasonable certainty at the time of an earlier transfer." *Id.* § 1.707-3(b)(2)(i). In this case, they were. When investors signed partnership and subscriptions agreements and made their contributions to the Funds, the Funds promised them a precise number of tax credits in exchange, so that each investor knew with specificity the size of the subsequent transfer he or she could expect.[17] The Funds further promised to deliver these credits for use in investors' 2001 tax calculations, making the timing of these transfers reasonably certain as well.

We next examine whether the investors had "a legally enforceable right" to the later transfer of credits. *Id.* § 1.707-3(b)(2)(ii). This factor also weighs in favor of finding a sale. The partnership and subscriptions agreements between the Funds and their investors explicitly promised delivery of tax

---

[17]Although the parties disagree over whether the transfer of credits occurred "simultaneously" with investor payments, as the subscriptions agreements stated, or at the point when Schedules K-1 were distributed to investors several months later, as the Tax Court found, this factual dispute is not of critical importance. Even if we assume that the tax credits were not allocated to the investors until Schedules K-1 were distributed, the timing and amount of these subsequent transfers were known when investors made their contributions to the Funds.

credits to investors in exchange for capital contributions. Had the Funds acquired tax credits that they then refused to allocate to investors, the investors could have pursued a breach of contract claim against them.

The third relevant factor is whether "the partner's right to receive the transfer of money or other consideration is secured in any manner." § 1.707-3(b)(2)(iii). The investors' contributions were secured in several ways. First, the Funds promised that investor capital would be refunded if sufficient credits could not be obtained or were revoked.[18] Second, the Funds protected investors' contributions by requiring their Operating Partnerships to agree to refund the Funds' contributions in the event that promised credits were not delivered.

Moreover, investors' receipt of tax credits was further secured by the Funds' promise to give investor money only to Operating Partnerships that had "received certification from the [DHR] that the rehabilitation constitutes a qualified rehabilitation and the amount of qualified rehabilitation expenditures . . . ." J.A. 2069. The Funds' promise not to make any significant investment until rehabilitations were already guaranteed to meet state approval meant that there was little risk of funding being given to Operating Partnerships who could not deliver credits in return.

The Treasury Regulation's ninth factor—whether "the transfer of money or other consideration by the partnership to the partner is disproportionately large in relationship to the partner's general and continuing interest in partnership profits"—strongly counsels in favor of finding a disguised sale.

---

[18]It is true that investors were promised only a refund of their contributions "net of expenses." J.A. 438. However, there was very little risk that any expenses would be deducted from their contributions, given that Operating Partnerships agreed to pay $20,000 of the Funds' expenses, the General Partner agreed to pay the rest, and "it [wa]s not anticipated that the annual operating expenses [would] be high." J.A. 2073.

Treas. Reg. § 1.707-3(b)(2)(ix). The investors had essentially *no* interest in partnership profits under their arrangement with the Funds. According to their subscription agreements, most investors owned a .01% partnership interest in one of the Funds, even though the partnership agreements reflect that a more complicated apportionment mechanism had been contemplated. In any event, investors were likely unconcerned about the precise amount of their partnership interest because the offering memo told them to expect *no* material amounts of partnership profits. Thus, the transfer of tax credits to each investor by the partnership had no correlation to each investor's interest in partnership profits whatsoever. To the contrary, the size of each transfer was tied exclusively to the amount of money the investor contributed to the Funds.

Finally, the Treasury Regulation's tenth factor, whether partners had any "obligation to return or repay the money or other consideration to the partnership," *id.* § 1.707-3(b)(2)(x), also points toward finding a sale. After receiving the tax credits, the investors had no further obligations or relationship with the partnership. Instead, they were free to use the credits for their own benefit.

Particularly in light of the presumption that a sale occurred unless clearly demonstrated otherwise, the foregoing factors strongly counsel for a finding that these transactions were sales.[19] We note as well that the partnership status of the investors to the Funds was transitory in nature. Investors joined at the end of 2001 or beginning of 2002 and were all bought out for the proverbial pittance, through the power of attorney given to Gecker at the time they entered the partnership, in May 2002, soon after tax filings were due. Although this factor is not included in the Department of the Treasury's

---

[19]Appellees have pointed to no reason to think that any of the five § 1.707-3(b)(2) factors not analyzed here counsel against finding a "sale." These additional factors simply are not of particular relevance to the way the instant transactions were structured.

regulations, the Joint Committee deems it relevant, explaining that "[t]ransitory partner status (which limits the duration of a purported joint undertaking for profit) suggests that a payment is a fee or is in return for property." Joint Comm. Report at 228; *see also G-I Holdings Inc.*, 2009 WL 4911953, at *21 (examining this factor, drawn from the legislative history, in evaluating whether a disguised sale occurred).

Instead of examining the enumerated § 1.707-3(b)(2) factors, the Tax Court conducted its own evaluation of the investors' level of "entrepreneurial risk," which it is certainly free to do. Section 1.707-3(b)(2) simply reflects those characteristics the Department of the Treasury, given its experience and expertise, thinks significant. *See* Treas. Reg. § 1.707-3(b)(1)-(2). Thus, although we would have found the Tax Court's analysis of the factors helpful, we cannot say that a court in every instance is required to tick through them mechanically. Even if the Tax Court's independent assessment of entrepreneurial risk was appropriate, however, we believe its conclusions in that regard miss the mark.

Again, § 1.707-3(b)(1) explains that a transaction should be reclassified as a sale if: (1) the transfer of money "would not have been made but for" the transfer of property in exchange; and (2) the later transfer "is not dependent on the entrepreneurial risks of partnership operations." There is no dispute that the "but for" test is satisfied here. The Tax Court instead relied on its conclusion that the Funds' investors, after giving their money but before receiving tax credits in exchange, faced the "entrepreneurial risks" involved in the Funds' partnership operations. It clarified as follows:

> [T]he partners faced the risk that developers would not complete their projects on time because of construction, zoning, or management issues. They also faced the risk that the DHR would not be satisfied with the rehabilitation and the developers would not receive the credits. Finally, they faced the risk that

> the DHR would revoke the credits and recapture them in later years. Accordingly, the partners risked their anticipated net economic benefit.
>
> . . .
>
> The investors also faced risks from the partnerships' ownership interests in the developer partnerships. These risks ranged from liability for improper construction to the risk of mismanagement or fraud at the developer partnership level. . . . Further, the investors faced the risks of fraud by another investor, retroactive changes in the law, and litigation in general.

*Va. Historic*, 2009 WL 4980488 at *14-15.

Upon closer examination, however, these risks appear both speculative and circumscribed. As the Tax Court acknowledged, "[t]he investors received assurance that their contributions would be refunded if . . . the anticipated credits could not be had or were revoked." *Id.* at *14. It is true, as the court recognized, that there was indeed no guarantee that resources would remain available in the source partnership to make the promised refunds. But it is also true that the Funds were structured in such a way as to render the possibility of insolvency remote.

Several facts point to the conclusion that there was no true entrepreneurial risk faced by investors here. First, investors were promised what was, in essence, a fixed rate of return on investment rather than any share in partnership profits tied to their partnership interests. The Funds explained the fixed arrangement that they would have with investors in precise terms in their offering memorandum: "An Investor will make a capital contribution to the Partnership in an amount equal to $.74 for each $1.00 of Virginia Historic Credit available for use by the Investor in calendar year 2001 . . . ." J.A. 2068.

Second, the Funds assigned each investor an approximate .01% partnership interest and explicitly told investors to expect no allocations of "material amounts of . . . partnership items of income, gain, loss or deduction." J.A. 2069. Third, investors were secured against losing their contributions by the promise of a refund from the Funds if tax credits could not be delivered or were revoked. And fourth, the Funds hedged against the possibility of insolvency by promising investors that contributions would be made only to completed projects and by requiring the Operating Partnerships to promise refunds, in some cases backed by guarantors, if promised credits could not be delivered.

We find persuasive the Commissioner's contention that the only risk here was that faced by any advance purchaser who pays for an item with a promise of later delivery. It is not the risk of the entrepreneur who puts money into a venture with the hope that it might grow in amount but with the knowledge that it may well shrink. *See, e.g.*, *C.I.R. v. Tower*, 327 U.S. 280, 287 (1946) (explaining that a partnership involves "sharing in the profits or losses or both"); *see also* Joint Comm. Report at 226 (explaining that partners "pool their assets and labor for the joint production of profit," and that "[t]o the extent that a partner's profit from a transaction is assured without regard to the success or failure of the joint undertaking, there is not the requisite joint profit motive"). For these reasons, we disagree with the Tax Court's conclusion that the Funds "clearly established" that their investors faced entrepreneurial risks sufficient to overcome the regulatory presumption that these transactions were sales. We therefore agree with the Commissioner that the Funds should have included the money received from investors as income in their tax returns, and uphold the adjustments in the FPAAs issued to the Funds in 2002.[20]

---

[20]We reach this conclusion mindful of the fact that it is "the policy of the Federal Government" to "assist State and local governments . . . to

## III.

The decision of the Tax Court is hereby reversed and remanded for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*

---

expand and accelerate their historic preservation programs and activities." 16 U.S.C. § 470-1(6). And we find no fault in the Tax Court's conclusion that both the Funds and the Funds' investors engaged in the challenged transactions with the partial goal of aiding Virginia's historic rehabilitation efforts. But Virginia's Historic Rehabilitation Program is not under attack here.

We are asked only to consider the federal tax treatment of the Funds' transactions. The Funds remain free to continue their partnership arrangement with investors under Virginia law, and investors remain free to utilize the historic rehabilitation tax credits they receive through this arrangement in their state tax filings.