IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

TERRENCE SEDGEWICK )
and SUSANNAH SEDGEWICK, )
)
Plaintiffs, ) TC-MD 170205G
)
v. )
)
DEPARTMENT OF REVENUE, )
State of Oregon, )
)
Defendant. ) **FINAL DECISION**[1]

On cross-motions for summary judgment, this case presents the question of whether

taxable income is generated by the use of a Business Energy Tax Credit (BETC) purchased at a

discount. Plaintiffs (taxpayers) appealed assessments for 2012, 2013, and 2014.

## I. STATEMENT OF FACTS

Before relating the facts of this case, it will be helpful to briefly describe the Business

Energy Tax Credit.

A.    *Business Energy Tax Credits*

The BETC is a nonrefundable tax credit allowed to certain owners, purchasers, or lessees

of facilities certified as meeting energy-conservation standards, or, alternatively, to "a person to

whom a tax credit for the facility has been transferred[.]" ORS 315.354(3)(c); 469B.145(1)(c)

(2011); 469.205(1)(c) (2009).[2,3] The credit may be claimed over a period of up to five years, and

its total amount is based on the cost of the facility. ORS 315.354(1).

---

[1] This Final Decision incorporates without change the court's Decision, entered July 13, 2018. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

[2] Unless otherwise indicated, the court's references to the Oregon Revised Statutes (ORS) are to 2011 and the statute in question did not materially change during the relevant period.

[3] ORS 469B.130 to 469B.169 were renumbered in 2011. In 2009, they were ORS 469.185 to 469.225.

Transfer of a BETC is authorized by ORS 469B.148(1), which states: "The owner of a facility may transfer a tax credit for the facility in exchange for a cash payment equal to the present value of the tax credit." [4] Under the accompanying regulations, purchasers of BETCs are identified as "pass-through partners." OAR 330-090-0110(49).[5] Until November 2009, the term "pass-through partner" included "persons and business" generally. OAR 330-090-0110(49) (June 20, 2008). Beginning in November 2009, only a "personal income tax payer, individual, C corporation or S corporation" could qualify as a pass-through partner. *Former* OAR 330-090-0110(45) (Nov 3, 2009) *renumbered as* OAR 330-090-0110(49) (Apr 30, 2010).

B.      *Taxpayers' Returns*

During each of the years at issue—2012, 2013, and 2014—taxpayers filed a personal income tax return for the previous year—2011, 2012, and 2013—in which they offset their tax liability by claiming a BETC. Taxpayers bought the BETCs from owners of certified facilities (a university and an energy company) at three times—in September 2009, January 2012, and June 2013. The cost was 33-percent less than each BETC's face value; for example, taxpayers paid $120,600 for the first BETC, which entitled them to $180,000 in tax credits over five years.

Defendant (the department) adjusted taxpayers' 2012, 2013, and 2014 returns to include as capital gains the discount allocable to the portion of the BETC used. That is, the department included as income the difference between the amount of taxpayers' tax liability offset by the BETC and the apportioned amount of that BETC's purchase price. The department also imposed the substantial understatement penalty.

/ / /

---

[4] ORS 469.206(1) (2009) provides similarly.

[5] A different version of the Oregon Administrative Rules was in effect at each of the times taxpayers purchased one of the BETCs at issue. The term "pass-through partner" did not change, although its definition was restricted in 2009 as discussed in the text.

Taxpayers request that the department's adjustments and assessments be reversed, and the department requests that its assessments be upheld.

## II.  ANALYSIS

The issue in this case is whether the reduction in tax liability from use of a purchased BETC is income to the extent it exceeds the BETC's purchase price.

Subject to additions, subtractions, and modifications not pertinent here, taxable income in Oregon is equal to taxable income as defined in the Internal Revenue Code (IRC)—that is, gross income minus deductions.  ORS 316.022(6); 316.048; *see* IRC § 63.  Insofar as practical, the court follows federal case law and administrative law when interpreting the IRC.  *See* ORS 316.032(2).  On summary judgment, the court grants relief where "there is no genuine issue as to any material fact and * * * the moving party is entitled to prevail as a matter of law."  TCR 47 C.[6]

A.      *Income and Tax Credits in General*

Gross income "means all income from whatever source derived," with specific inclusions and exclusions.  IRC § 61(a).  However, as commentators have noted, the word *income* is not defined in the IRC.  Boris Bittker & Lawrence Lokken, 1 *Federal Taxation of Income, Estates & Gifts* ¶ 5.1, 5-2 (3rd ed 1999).  In the early days of the federal income tax, the United States Supreme Court defined *income* as "the gain derived from capital, from labor, or from both combined," laying special emphasis on the necessity that income be "*severed from* the capital" in order to be "derived" from it.  *Eisner v. Macomber*, 252 US 189, 207, 40 S Ct 189, 64 L Ed 521 (1920) (emphasis original).  While *Macomber* has never been expressly overruled, the Court in recent years has preferred its broader formulation in *Commissioner v. Glenshaw Glass Co.*, 348

---

[6] The Tax Court Rules (TCR) are applicable as a guide pursuant to the Preface of the Tax Court Rules–Magistrate Division (TCR–MD).

US 426, 75 S Ct 473, 99 L Ed 483 (1955), in which gross income was found where there were "instances of undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." 348 US at 431. Relying on *Glenshaw Glass*, the Court has stated that the definition of gross income found in IRC section 61(a) "extends broadly to all economic gains not otherwise exempted." *Commissioner v. Banks*, 543 US 426, 433, 125 S Ct 826, 160 L Ed 2d 859 (2005); *cf. Glenshaw Glass*, 348 US at 430.

Despite the categorical language of *Banks*, the IRC's definition of income does not, in fact, include all economic benefits lacking a specific exemption. *See*, *e.g.*, *Commissioner v. Indianapolis Power & Light Co.*, 493 US 203, 110 S Ct 589, 107 L Ed 2d 591 (1990) (although utility gained economic benefit from customers' advance deposits, deposits were not taxable on receipt because utility did not have complete dominion over them).[7] Likewise, as theorists have noted, income from rent is not imputed to homeowners who live in their own houses, nor is income from services received imputed to those who perform housework for themselves. Bittker & Lokken, 1 *Federal Taxation of Income, Estates & Gifts* ¶ 5.3 at 5-22–29.

Among the economic benefits not included in gross income are reductions in tax liability by use of tax credits. A taxpayer who offsets income using a tax credit "has received no money or other 'income' within the meaning of the Internal Revenue Code." *Randall v. Loftsgaarden*, 478 US 647, 657, 106 S Ct 3143, 92 L Ed 2d 525 (1986) (citing IRC § 61). Nonrefundable tax credits have "no value in themselves"; rather, they effect "a statutory decrease in the tax liability of each individual taxpayer." *Id*. at 656–57; Rev Rul 79-315, 1979-2 CB 27. Thus, the general rule is that "[u]sing a tax credit to offset a tax liability is not an accession to wealth." *Tempel v. Commissioner*, 136 TC 341, 351 (2011), *aff'd sub nom. Esgar Corp. v. Commissioner*, 744 F3d

---

[7] The distinction between "economic gains" and "income" is not clear. It may be that a definition of one that includes the other is circular.

648 (10th Cir 2014).[8] Unless a more specific rule applies, a reduction in tax liability by use of a tax credit is not income.

B.      *Gains Derived from Dealings in Property*

The department argues that use of a purchased BETC falls within a more specific rule: the inclusion of "[g]ains derived from dealings in property" in IRC section 61(a)(3)'s definition of gross income. Such gains are realized upon the "sale or other disposition of property." IRC § 1001(b). The department argues that a purchased BETC is property and, therefore, its use is a "disposition of property" on which a taxpayer must recognize gain. The question, at least initially, is whether a purchased BETC is "property" for purposes of IRC section 61(a)(3).

1.      *Property in General*

In its broadest sense, "property" refers to " 'every species of right or interest protected by law and having an exchangeable value.' " *Jewett v. Commissioner*, 455 U.S. 305, 309, 102 S.Ct. 1082, 71 L.Ed.2d 170 (1982) (quoting S. Rep. No. 665, 72d Cong., 1st Sess., 39 (1932); H.R. Rep. No. 708, 72d Cong., 1st Sess., 27 (1932)), quoted by *Drye v. United States*, 528 US 49, 56, 120 S Ct 474, 145 L Ed 2d 466 (1999).

In *United States v. Craft*, the United States Supreme Court used the metaphor of a "bundle of sticks" to analyze whether a taxpayer's interests in a parcel of real property were "property and rights to property" for purposes of the federal tax lien statute. 535 US 274, 278– 79, 122 S Ct 1414, 152 L Ed 2d 437 (2002). The Court explained that the "bundle of sticks" was the "collection of individual rights which, in certain combinations, constitute property." *Id*. at 278. The Court's process was to first identify the individual rights created by state law and then to evaluate whether the collective bundle of state-law rights constituted "property" under federal

---

[8] However, state tax credits "that do not just reduce state-tax liability but are actually refundable are taxable income." *Maines v. Commissioner*, 144 TC 123, 138 (2015).

law. *Id.* at 282; *cf. Drye*, 528 US at 58 (looking to "state law to determine what rights the taxpayer has in the property," then to "federal law to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of the federal tax lien legislation").

      2.      *Transferable Tax Credits as Property*

The Fourth Circuit considered whether transferable state tax credits were property in the hands of a transferee in *Virginia Historic Tax Credit Fund 2001 LP (Virginia Historic) v. Commissioner*, 639 F3d 129 (4th Cir 2011). The court applied the "bundle of sticks" analysis, identifying the relevant property rights as " 'the right to use the property, to receive income produced by it, and to exclude others from it[.]' " *Id.* at 141 (quoting *Craft*, 535 US at 283). The court also identified as relevant "the 'breadth of the control the taxpayer could exercise over the property' and whether the right in question was 'valuable.' " *Id.* (Quoting *Drye*, 528 US at 60–61.) Finally, the court summarized a footnote from *Drye* as identifying transferability as "relevant," although not "essential" to a finding of property status. *Id.* (Citing *Drye*, 528 US at 60 n 7.)

The court in *Virginia Historic* found that transfer of a state tax credit from a partnership to a partner in exchange for a contribution was a transfer of "property." Analyzing the property rights bundled into the Virginia tax credit, it found they had "pecuniary value" because purchasers were willing to pay for them. *Va. Historic*, 639 F3d at 141. The court also found that the taxpayers exercised "proprietary control" over the credits, meaning they "could exclude others from using the credits and were free to keep or pass along the credits to partners as they saw fit." *Id.* The court paid particular attention to the issue of transferability. Although direct sale and resale of Virginia tax credits was prohibited by law, Virginia's law had "a partnership

allocation provision that permitted state tax credits allocated to a partnership to be divided among the partners 'as the partners or shareholders mutually agree.' " *Va. Historic*, 639 F3d at 133. The court found that Virginia's prohibition on tax credit transfers was only "nominal" because "it is a relatively simple matter in Virginia to effectuate a third-party transfer by forming a partnership with an interested buyer who is then 'allocated' the credits in exchange for a contribution to the partnership." *Id*. at 141–42. The tax credits at issue in *Virginia Historic* were transferable because they were in the hands of a partnership.

3.     *Transferability Requisite to Property Status of Tax Credits*

Considering the *Virginia Historic* court's reasoning, it appears the distinctive right that made the Virginia tax credits "property" was their transferability. The credits' pecuniary value arose from the willingness of others to pay to have them transferred. As this court has observed in the context of property valuation,

> "an underlying assumption of market value is that the market will only pay for those benefits it will receive. If tax benefits are limited to the first owner or are recaptured when a property is transferred, such benefits will not enter into market considerations."

*Bayridge Assoc. Ltd. Partnership v. Dept. of Rev.*, 13 OTR 24, 29 (1994), *aff'd*, 321 Or 21, 892 P2d 1002 (1995). Tax credits only have value on the market if they can be transferred to a buyer. Additionally, the *Virginia Historic* court found proprietary control of the credits hinged on the freedom of holders "to keep or pass along the credits to partners as they saw fit." *Va. Historic*, 639 F3d at 141. While the abilities to use the credits and exclude others from using them were certainly essential property rights, those rights did not differentiate the Virginia tax credit from nontransferable credits whose use would not generate income.

Given the importance of transferability in the *Virginia Historic* analysis, it might be said that transferability is "essential" to a finding that a tax credit is property. That would not

contradict *Drye*.  In *Drye*, the Supreme Court held that an interest in a trust was "property" for purposes of the federal tax lien statute.  *Drye*, 528 US at 61.  In a footnote, the Court recognized "that state-law rights that have pecuniary value and are transferable" make up "property" subject to lien.  *Id*. at 60 n 7.  Noting that a lower court had held an interest in a nontransferable spendthrift trust was also "property" subject to lien, the Court stated that it did "not mean to suggest that transferability is essential to the existence of 'property.' " *Id*.  The *Drye* court's statement that at least one kind of property is not transferable does not imply that transferability might not be essential to other kinds of property, such as tax credits.

That transferability is what makes transferable tax credits "property" can be seen by considering nontransferable tax credits.  It is tautological that transferable credits differ from nontransferable credits in their transferability.  Yet the use of nontransferable tax credits is not "disposition of property" and does not result in "[g]ains from dealings in property" under IRC sections 61(a)(3) and 1001(b).  If it was, the use of such a credit would require recognition of a gain—a result forbidden by *Loftsgaarden* as well as Revenue Ruling 79-315.  A nontransferable tax credit is not "property" for purposes of IRC section 61(a)(3).  The conclusion to be drawn is that where a transferable tax credit is considered "property" it is because of its transferability.

4.      *Mutability of Property Status*

If transferability is the one "stick" in the property-rights bundle that determines whether a tax credit is property, the loss of the right to transfer a tax credit implies a loss of property status. In the case of a tax credit that is transferable only one time, a tax credit that was property in the hands of its original holder would not be property in the hands of a transferee.[9]

---

[9] This conclusion raises the question of whether transferable tax credits are property in the hands of their original holders.  Such a finding would be consistent with the statement of the United States Tax Court in *Tempel* that a "grant of State tax credits creates cognizable property rights in those credits for the recipients of those credits."  *Tempel*, 136 TC at 354 (rejecting argument that basis in land subjected to easement in exchange for

However, a different line of reasoning was adopted by counsel for the IRS in two chief counsel advisories and two private letter rulings that the department urges the court to review. *See* IRS CCA 201147024 (Nov 25, 2011); Priv Ltr Rul 200951024 (Dec 18, 2009); IRS CCA 200445046 (Nov 5, 2004); Priv Ltr Rul 200348002 (Nov 28, 2003).[10]

In the unpublished advisories and letter rulings, the feature that distinguishes tax credits that are "property" from those that are not is whether a transferee "has purchased the Credit for value." PLR 200348002; *see also* CCA 200445046 ("a transferee has purchased a credit for value and the credit is 'property' in the transferee's hands rather than a factor in the calculation of tax due"); Priv Ltr Rul 200951024 ("if and when a transferable credit is in fact transferred to another taxpayer for value, the transaction is a sale and purchase of property for purposes of § 1001 and § 1012"). The reasoning is sparse, but IRS counsel apparently began from the proposition that a tax credit is a reduction in liability rather than an accession to wealth. *See* Priv Ltr Rul 200951024. For that reason, the grant of a transferable tax credit by the state is not "a payment of cash or property" that would require its inclusion in the recipient's gross income. *Id*. The tax credit becomes property when it is purchased for value, after which point the use of the tax credit by the purchaser is not merely a reduction in liability; it is a transfer of "property" to the state in satisfaction of a tax liability. IRS CCA 201147024. Thus, IRS counsel allow

transferable tax credits was allocable to credits because property rights in land and credits were distinct). Another possibility is that the original holder's power to transfer the credit was not a property right, but instead a limited delegation of the state's sovereign authority to grant a credit (conditions for the exercise of which include payment and the holder's renunciation of the credit). *Cf. United States v. Griffin*, 324 F3d 330, 354–55 (5th Cir 2003) (holding federal tax credits assigned to state agency for reallocation to taxpayers were not property while in possession of agency). Because transferred credits would lack property status under either scenario, the court does not inquire further.

[10] Unpublished written determinations "may not be used or cited as precedent." IRC § 6110(k)(3); *cf.* Treas. Reg. § 601.601(d)(1), (d)(2)(i)(a) (contrasting an "unpublished ruling or decision," which will not be "relied on, used, or cited by any officer or employee of the Service as a precedent in the disposition of other cases" with a Revenue Ruling—"an official interpretation by the Service that has been published in the Internal Revenue Bulletin"). The court therefore gives the advisories and letter rulings no precedential weight, but looks to them only for their reasoning, as it would to treatises or law review articles.

taxpayers to claim the amount by which purchased tax credits reduce state tax liability as a deduction for state taxes paid on their federal returns under IRC section 164(a)(3). Priv Ltr Rul 200348002; IRS CCA 200445046. Likewise, IRS counsel treat taxpayers who use credits purchased at a discount as realizing gains on the disposition of property. Priv Ltr Rul 200951024; IRS CCA 201147024.[11]

The above reasoning assumes that the law excluding nontransferable tax credits from income applies equally to the initial recipients of transferable tax credits. Under the reasoning of *Loftsgaarden*, that proposition is not obvious. The Court in *Loftsgaarden* held that receiving nontransferable tax credits was not income because the credits had "no value in themselves" and only generated a benefit by reducing the holder's liability. 478 US at 656–57. However, transferable tax credits clearly do have value besides reduction in the holder's tax liability—they can be sold. Thus, transferable credits have value even to tax-exempt organizations, such as the university that sold BETCs to taxpayers in this case. The unpublished advisories and private letter rulings do not consider whether that additional value indicates a different property status for transferable credits.

While the private letter rulings and advisories agree with the Fourth Circuit that finding a tax credit has "value" is important to its status as property, their reasoning differs importantly. The court determined a tax credit was property in part because it had "pecuniary value"— meaning that it could still "induce investors to contribute money." *Va. Historic*, 639 F3d at 141. The court's conception of value was market-based: a thing has value when someone is willing to pay for it. By contrast, IRS counsel reasoned that a tax credit became property when it was purchased "for value." That formula leaves ambiguous the relation between the credit's present

---

[11] The advisories and letter rulings do not discuss whether a taxpayer whose purchased tax credits expire may claim a loss.

property status and its prior sale. A prior purchase "for value" may indicate a thing's value both to its owner and to the market. The price paid by the holder of a tax credit is certainly an indicator of the value placed on the credit by its holder. However, the credit's purchase is an indicator of market value only if it can be inferred that the credit would again sell on the market.

This court is persuaded that the market-based conception of value is the relevant one for determining property status. *See Va. Historic*, 639 F3d at 141; *Bayridge*, 13 OTR at 29. While it is undoubted that a tax credit has value to its holder due to its potential to reduce tax liability, such value does not distinguish transferable from nontransferable credits. In the case of credits transferable only once, their prior purchase "for value" does not show that they have any present market value. Such credits lose the "stick" of transferability when they change hands—they are removed from the market and their market value is reduced to zero. A purchased tax credit that is no longer transferable has no more "pecuniary value"—and no more property status for purposes of IRC section 61 (a)(3)—than a nontransferable credit.

C.    *Taxpayers' BETCs*

Under Oregon law, a BETC for a facility is transferable only by the owner of the facility, effectively making BETCs transferable only one time. *See* ORS 469B.148(1). In *Virginia Historic*, a prohibition on transferring credits was held to be only nominal where a partnership was free to acquire tax credits and allocate them among its partners. That avenue was not available to holders of BETCs during the years at issue. In 2009, the regulations were amended to close off the possibility of transferring BETCs to partnerships. *Compare former* OAR 330-090-0110(45) (Nov 3, 2009) *with* OAR 330-090-0110(49).

Because taxpayers did not hold their BETCs in the name of a partnership, they could not have reallocated their BETCs to partners in any event, and no party has suggested taxpayers had

any practical means of transferring their BETCs to third parties. Taxpayers never had the right to transfer their BETCs; that "stick" was not passed on to taxpayers by the original holders. Taxpayers had no more rights in their purchased BETCs than in a nontransferable tax credit. Without transferability, the BETCs were not "property" in the hands of taxpayers.

Because the BETCs were not property at the time they were used, their use was not a disposition of property. Because their use was not a disposition of property, the concomitant reduction in taxpayer's tax liability was not a gain from dealings in property. Use of transferred BETCs does not fall within IRC section 61(a)(3)'s exception to the general rule that offsets to tax liability from credits are not includible in taxable income.

## III. CONCLUSION

Because use of a purchased BETC does not generate gains from dealing in property, it is no different than use of a nontransferable credit and does not result in income to the taxpayers. Now, therefore,

IT IS THE DECISION OF THIS COURT that taxpayers' motion for summary judgment is granted.

IT IS FURTHER DECIDED that the department's motion for summary judgment is denied.

Dated this ____ day of July, 2018.

POUL F. LUNDGREN
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed.  TCR-MD 19 B.*

*This document was signed by Magistrate Poul F. Lundgren and entered on July 31, 2018.*