UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 14-1983**

---

ROUTE 231, LLC, JOHN D. CARR, TAX MATTERS PARTNER,

Petitioner - Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent - Appellee.

---

Appeal from the United States Tax Court.
(Tax Ct. No. 013216-10)

---

Argued:  October 28, 2015          Decided:  January 8, 2016

---

Before AGEE and WYNN, Circuit Judges, and HAMILTON, Senior
Circuit Judge.

---

Affirmed by published opinion.  Judge Agee wrote the opinion, in
which Judge Wynn and Senior Judge Hamilton joined.

---

**ARGUED:** Timothy Lee Jacobs, HUNTON & WILLIAMS LLP, Washington,
D.C., for Appellant.  Richard Farber, UNITED STATES DEPARTMENT
OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:** William
L.S. Rowe, Richmond, Virginia, Richard E. May, Hilary B. Lefko,
Matthew S. Paolillo, HUNTON & WILLIAMS LLP, Washington, D.C.,
for Appellant.  Caroline D. Ciraolo, Acting Assistant Attorney
General, Regina S. Moriarty, Tax Division, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

AGEE, Circuit Judge:

Route 231, LLC, a Virginia limited liability company, ("Route 231") reported capital contributions of $8,416,000 on its 2005 federal tax return.[1] This number reflected, in relevant part, $3,816,000 it received from one of its members, Virginia Conservation Tax Credit FD LLLP ("Virginia Conservation"). Upon audit, the Commissioner of the Internal Revenue Service issued a Final Partnership Administrative Adjustment ("FPAA") indicating that Route 231 should have reported the $3,816,000 received as gross income and not a capital contribution. Route 231 challenged the FPAA by petition to the United States Tax Court. After a trial, the Tax Court determined that the transaction was a "sale" and reportable as gross income in 2005. Route 231 now appeals, asserting that the Tax Court erred in finding the transfer was not a capital contribution or, alternatively, that any income was not reportable until 2006. For the reasons set forth below, we disagree with Route 231 and affirm the decision of the Tax Court.

---

[1] The Internal Revenue Code treats limited liability companies with two or more members as a partnership unless the company elects otherwise. See 26 C.F.R. §§ 301.7701-1, 7701-2, 7703-3. Route 231 filed returns consistent with being treated as a partnership for federal tax purposes.

I.

In May 2005, Raymond Humiston and John Carr formed Route 231, a limited liability company ("LLC") registered in Virginia. Humiston and Carr each made initial capital contributions of $2,300,000 and each received a 50% membership interest in the LLC. Route 231's initial operating agreement stated its purpose was "to own, acquire, manage and operate [certain] real property." (J.A. 225.) Consistent with that purpose, Route 231 purchased two parcels, known as Castle Hill and Walnut Mountain, in Albemarle County, Virginia, for approximately $24 million. Carr and Humiston personally guaranteed the bank loan financing the purchase.

Carr and Humiston were interested in donating some of Route 231's property for conservation purposes and retained a consultant to assist with that process. At that time, Virginia offered state income tax credits "equal to 50 percent of the fair market value of any land or interest in land located in Virginia" donated to a public or private agency eligible to hold such land and interests therein for conservation or preservation purposes. Va. Code § 58.1-512 (2005). Through the consultant, Route 231 discussed the possibility of Virginia Conservation joining the LLC by contributing money to Route 231 and receiving a majority of the Virginia tax credits that would be earned as a result of three proposed conservation donations.

These discussions led to Route 231's first amended operating agreement, signed December 27, 2005, in which Virginia Conservation became a member of Route 231 with a 1% membership interest, with Humiston and Carr's interests each being reduced to 49.5%. The amended operating agreement provided that Virginia Conservation agreed to make an "initial capital contribution" of $500 plus an additional sum "in an amount equal to the product of $0.53 for each $1.00 of [the tax credits] allocated to" it. (J.A. 477, § 2.2.) The first amended operating agreement anticipated that Route 231 would earn Virginia tax credits "in the range of $6,700,000 to 7,700,000" as a result of the proposed conservation donations, and it provided that while Carr would receive $300,000 of credits, Virginia Conservation would receive "the balance."[2] (J.A. 479, § 3.6.)

Two days later, on December 29, 2005, Virginia Conservation paid $3,816,000 into an escrow account pursuant to three escrow agreements reflecting the three conservation donations Route 231

---

[2] For tax credits earned during the time in question, taxpayers could claim up to $100,000 of tax credits on their state income tax returns as a $1 for $1 credit. If the value of tax credits earned exceeded this cap, taxpayers were permitted to carry over the tax credits for use up to five years after the tax credits were earned. See Va. Code § 58.1-512(C)(1) (2005).

4

intended to make.[3] The escrow agreements provided that the funds would be released to Route 231 upon written confirmation by Virginia Conservation that it had received copies of several documents verifying the conservation donations and Virginia tax credits. One item listed was the Virginia Department of Taxation's transaction number for tracking the conservation donations and Virginia tax credits.

The next day, December 30, 2005, Route 231 recorded deeds conveying the following conservation donations of real property: (1) a deed of gift of an easement on Castle Hill to the Nature Conservancy, which was valued at $8,849,240; (2) a deed of gift of an easement on Walnut Mountain to the Albemarle County Public Recreational Facilities Authority, which was valued at $5,225,249; and (3) a fee interest in Walnut Mountain (subject to the above easement) to the Nature Conservancy, which was valued at $2,072,880.

The final value of these conservation donations – and hence the amount of Virginia tax credits – was slightly lower than Route 231's consultant had anticipated. Consequently, Carr agreed to defer receiving approximately $84,000 of the $300,000 in tax credits he had been promised in the first amended

---

[3] The escrow agreements contain nearly identical language, with each agreement corresponding to one of Route 231's proposed conservation donations.

5

operating agreement so as to allow Virginia Conservation to receive tax credits equivalent to the formula for the full amount of money it had paid into escrow.

On January 1, 2006, Humiston, Carr, and Virginia Conservation executed a second amended operating agreement for Route 231. The agreement described the three specific conservation donations the LLC had made and set out the Virginia tax credits Route 231 had earned as a result of those donations. It indicated that those credits "have been allocated as follows: (i) $215,983.00 . . . to Carr and (ii) $7,200,000.00" to Virginia Conservation. (J.A. 508, § 3.5.)

After execution of the second amended operating agreement, Route 231 submitted three Virginia Land Preservation Tax Credit Notification Forms ("Forms LPC") to the Virginia Department of Taxation. The forms stated that Route 231 had earned its Virginia tax credits on December 30, 2005 (the date of the conservation donations), and that it allocated those credits to Carr and Virginia Conservation in the amounts reflected in the second amended operating agreement.

In March 2006, the Virginia Department of Taxation provided Virginia Conservation and Carr with the transaction numbers for Route 231's conservation donations and the tax credits. The Virginia Department of Taxation's letter stated that these tax credits were "effective" in 2005.

6

Soon after Virginia Conservation received these tax credit transaction numbers, the escrow funds were released to Route 231.

In April 2006, Carr – acting as Route 231's tax matters partner – filed Route 231's 2005 federal Return of Partnership Income Tax.[4] Schedule M-2 of that form lists total annual capital contributions received in 2005 in the amount of $8,416,000, which includes the amounts Humiston and Carr had provided as capital contributions as well as the $3,816,000 Virginia Conservation paid into escrow. In addition, Schedule K-1 of Route 231's tax form lists Virginia Conservation as a partner that had contributed $3,816,000 in capital "during the [taxable] year." (J.A. 120.)

---

[4] While there are substantive legal differences, particularly for state law purposes, between partnerships and limited liability companies, they are treated alike as partnerships for federal income tax purposes. See supra n.1. For convenience, we refer to partners and partnerships interchangeably with members and limited liability companies in our discussion of the federal tax issues in this opinion.

Under the Internal Revenue Code, a partnership is a "pass-through" entity, meaning that although the partnership prepares a tax return, the partnership does not pay federal income taxes. Instead, its taxable income and losses pass through to the individual partners, who in turn are liable for their distributive shares of the partnership's tax items on their own individual returns. United States v. Woods, 134 S. Ct. 557, 562 (2013).

7

The Internal Revenue Service sent Route 231 an FPAA indicating, in relevant part, that Route 231 had improperly characterized the $3,816,000 received as a capital contribution rather than as income from the sale of the Virginia tax credits to Virginia Conservation.[5] Route 231 challenged that determination in a petition for readjustment in the Tax Court. In a detailed memorandum opinion, the Tax Court upheld the Commissioner's determination that the transaction between Virginia Conservation and Route 231 constituted a "disguised sale" that occurred in 2005, and it adjusted Route 231's 2005 tax return to reflect the $3,816,000 as gross income.

At the outset of its opinion, the Tax Court described our decision in Virginia Historic Tax Credit Fund 2001 LP v. Commissioner, 639 F.3d 129 (4th Cir. 2011), as "squarely on point" with the case before it. (Cf. J.A. 1518.) Following much of the same analysis we applied in Virginia Historic, the Tax Court first concluded that Route 231's Virginia tax credits were "property" so their transfer would fall within the scope of I.R.C. § 707. Next, the Tax Court determined that under the applicable tax regulations of § 707, the transaction was a

---

[5] The FPAA made additional adjustments that were resolved by the parties. While those adjustments were included in the Tax Court's final decision reflecting all of the adjustments to Route 231's 2005 tax return, they are not at issue in this appeal.

"disguised sale" because the record demonstrated that (1) Route 231 would not have transferred the Virginia tax credits to Virginia Conservation "but for" the fact that Virginia Conservation transferred $3,816,000 to it, and (2) Route 231's transfer of the Virginia tax credits was not dependent on the ongoing entrepreneurial risks of Route 231's operations. In examining the totality of the facts and circumstances relevant to this inquiry, the Tax Court observed that the amended operating agreements set out the timing and amount of the exchange with "reasonable certainty"; they established Virginia Conservation's binding contractual right to the Virginia tax credits; and they secured Virginia Conservation's rights by an indemnification clause. In addition, the Tax Court observed that Virginia Conservation's share of the Virginia tax credits was disproportionately large in comparison to its membership interest and that it had no obligation to return the credits to Route 231. As such, the Tax Court held that the transfer between Route 231 and Virginia Conservation was a disguised sale and that the $3,816,000 received was thus gross income.

Lastly, the Tax Court rejected Route 231's argument that the transfer occurred for tax purposes in 2006, instead of 2005, for three separate and independent reasons. First, for purposes of federal tax law, the factual circumstances indicate the sale occurred in 2005; second, because Route 231 used the accrual

9

method of accounting, it had to report the transfer as income in 2005 regardless of when it received Virginia Conservation's payment; and, third, Route 231's statements in its 2005 tax return constituted binding admissions that the transfer of money (however characterized) occurred in 2005.

Route 231 noted a timely appeal, and this Court has jurisdiction pursuant to 26 U.S.C. § 7482(a)(1).

## II.

Route 231 reasserts its two arguments on appeal. It principally contends that the Virginia tax credit transaction with Virginia Conservation constituted a nontaxable capital contribution followed by a permissible allocation of partnership assets to a bona fide partner. In the alternative, Route 231 asserts that even if Virginia Conservation's payment was part of a sale of tax credits, then the sale occurred in 2006 and not 2005. If that is so, then because 2006 is a closed tax year as to Route 231, the IRS could not adjust income the LLC received in that year.[6]

---

[6] At the same time it issued the 2005 FPAA, the Commissioner issued an FPAA with respect to Route 231's 2006 tax return. However, Route 231 did not challenge those adjustments before the U.S. Tax Court. Accordingly, the limitations period for the IRS to adjust Route 231's 2006 return expired one year and 151 days after the date of the FPAA, see I.R.C. § 6229(d), or in August 2011. Therefore, 2006 is now a closed tax year.

In addressing these arguments, we review the decision of the Tax Court "on the same basis as [a] decision[] in [a] civil bench trial[] in United States district court[]." Waterman v. Comm'r, 179 F.3d 124, 126 (4th Cir. 1999). Accordingly, we review the Tax Court's legal conclusions de novo and its factual findings for clear error. Va. Historic, 639 F.3d at 142.

## A. Disguised Sale

It comes as no secret that taxpayers often seek to structure transactions creatively in an effort to minimize the tax consequences. Id. at 138. In response, Congress has enacted various statutes that look beyond form to substance in order to differentiate taxable and nontaxable events. Id. The characterization of the structure of Route 231's transaction with Virginia Conservation – a contribution to partnership capital or a sale of assets – has significant tax consequences: "[w]hereas a partnership must report any proceeds received from the sale of its assets as taxable income, partners' contributions to capital and a partnership's distributions to partners are tax-free." Id.

Relevant to this case is I.R.C. § 707, which "prevents use of the partnership provisions to render nontaxable what would in substance have been a taxable exchange if it had not been 'run through' the partnership." Id. In such a circumstance, the transaction between the partner and partnership is treated as if

11

a transaction between third parties regardless of the partnership format: "[i]f a partner engages in a transaction with a partnership other than in his capacity as a member of such partnership, the transaction shall, except as otherwise provided in this section, be considered as occurring between the partnership and one who is not a partner." I.R.C. § 707(a)(1)(A).

Particularly applicable in this case is § 707(a)(2)(B), which provides:

> (B) Treatment of certain property transfers. If--
>   (i) there is a direct or indirect transfer of money or other property by a partner to a partnership,
>   (ii) there is a related direct or indirect transfer of money or other property by the partnership to such partner (or another partner), and
>   (iii) the transfers described in clauses (i) and (ii), when viewed together, are properly characterized as a sale or exchange of property,
> such transfers shall be treated either as a transaction described in paragraph (1) . . . .

The treasury regulations further explain when such transactions are "properly characterized as a sale or exchange of property." See 26 C.F.R. § 1.707-3.[7] In general, a partner/partnership

---

[7] The regulation describes such "disguised sales" as transactions in which a partner transfers "property" to the partnership and the partnership transfers "money or other consideration to the partner." 26 C.F.R. § 1.707-3(a)(1). (Continued)

12

transaction is a sale "if based on all the facts and circumstances," "[t]he transfer of money or other consideration would not have been made but for the transfer of property" and, when the transfers are not simultaneous, "the subsequent transfer is not dependent on the entrepreneurial risks of partnership operation."  § 1.707-3(b)(1).

The regulations additionally provide a non-exclusive list of ten relevant facts and circumstances "that may tend to prove the existence of a sale," including whether "the timing and amount of a subsequent transfer are determinable with reasonable certainty at the time of an earlier transfer"; "the transferor has a legally enforceable right to the subsequent transfer"; "the partner's right to receive the transfer of money or other consideration is secured in any manner"; "the transfer of money or other consideration by the partnership to the partner is disproportionately large in relationship to the partner's general and continuing interest in partnership profits"; and "the partner has no obligation to return or repay the money or other consideration to the partnership[.]"  § 1.707-3(b)(2). The regulations also create a presumption of a sale whenever the

However, we have observed that the regulations specifically provide that these principles also apply when a partnership transfers "property" to a partner in exchange for "money or other consideration."  See Va. Historic, 639 F.3d at 139 (citing 26 C.F.R. § 1.707-6(a)).

13

partner/partnership transfers occur within a two-year period "unless the facts and circumstances clearly establish that the transfers do not constitute a sale." § 1.707-3(c)(1). "This presumption places a high burden on the partnership to establish the validity of any suspect partnership transfers." Va. Historic, 639 F.3d at 139.

Route 231 takes issue with the Tax Court's reliance on Virginia Historic in the application of § 707. Its arguments largely attempt to distinguish its transaction with Virginia Conservation from what occurred in that case, where a partnership "reported a series of transactions with investor partners" as capital contributions rather than as income from "sales" of state historic rehabilitation tax credits. Id. at 132-33. The Virginia Historic partnership actively sought investors to contribute "capital" in exchange for a less-than-one-percent partnership interest and an "allocation" of the state tax credits. Id. at 133-35. The Commissioner asserted that the investors were not bona fide partners and that "under the relevant Code provisions and regulations," "the transactions between the investors and the [partnership] should nevertheless be classified as sales for federal tax purposes[.]" Id. at 137.

We assumed, without deciding, that the investors were bona fide partners, but found that the Commissioner correctly classified that series of transactions. Id. After rejecting

14

the partnership's contention that the tax credits did not constitute "property" for purposes of the "disguised sales" rules, we concluded the partnership failed to overcome the presumption that the exchange was a "sale" based on the applicable regulatory factors. Id. at 140-46.

In attempting to distinguish Virginia Historic, Route 231 points to its "emphas[is] that [the Court was] not deciding whether tax credits always constitute 'property' in the abstract. Rather, [the Court was] asked to decide only whether the transfer of tax credits acquired by a non-developer partnership to investors in exchange for money constituted 'a transfer of property' for purposes of § 707." Id. at 141 n.15. Route 231 contends this language limited Virginia Historic's holding to sham partnerships that "ceased to exist as soon as the credits were transferred" and that the "disguised sale rules do not apply to a valid partnership with economic substance like Route 231." (Opening Br. 26.) Furthermore, Route 231 posits that because Virginia Conservation remains a bona fide partner in an ongoing partnership, the transfer of tax credits was "simply an allocation [of partnership assets] among partners, and not a sale of property by a sham entity to transitory investors." (Opening Br. 27.)

Route 231's argument misses the mark. We note initially that Route 231 does not challenge the validity of § 707 or the

15

corresponding regulations. For the most part, Route 231 also does not challenge the Tax Court's application of the § 1.707-3(c) "facts and circumstances" test to the circumstances surrounding its transaction with Virginia Conservation. Although Route 231 denies doing so, most of its arguments center on the premise that as Virginia Conservation is a bona fide partner in a bona fide partnership, its partner/partnership transactions are immune from the scope of § 707 and related provisions. Put another way, Route 231 contends § 707 cannot apply to the transaction at issue here because the entities involved are bona fide entities in a genuine contractual relationship.

The Commissioner does not contest that Route 231 is a valid entity or that Virginia Conservation is a true partner in it. Neither did the Tax Court rely on a failure of the bona fides of the entities in reaching its decision. There was no need to do so as Route 231's argument fails under the plain language of § 707, which expressly applies to transactions between a partner and partnership without qualification whenever a partner "engages in a transaction with a partnership other than in his capacity as a member of such partnership." The bona fides of Virginia Conservation's status as a member of Route 231, or that entity's status as a valid limited liability company (and valid partnership for tax purposes) do not matter for this inquiry.

16

In short, the analysis under § 707 goes to the bona fides of a particular transaction, not to the general status of the participants to that transaction. Contrary to Route 231's repeated assertions, I.R.C. § 707 applies by its plain terms to designated transactions between otherwise valid ongoing partnerships and their legitimate partners.[8]

Relatedly, in Virginia Historic we expressly did not analyze whether the partnership itself was legitimate, nor did we limit § 707's scope to sham partnerships. Quite the contrary, the Court expressly assumed the existence of a bona fide partnership and proceeded directly to analyzing whether the transaction nonetheless constituted a disguised sale under § 707. Cf. Va. Historic, 639 F.3d at 137. So, too, here: this case does not turn at all on characteristics of the Route 231

_____

[8] To supports its contention that § 707 and the disguised sale rules apply only when a partnership is illegitimate or a sham, Route 231 points to Historic Boardwalk Hall, LLC v. Commissioner, 694 F.3d 425 (3d Cir. 2012). There, the Third Circuit observed that some of the same principles applicable to disguised sales also apply in the separate context of determining whether a bona fide partnership exists. Where those points overlapped, the court relied in part on our decision in Virginia Historic. See id. at 454-55. Nothing about the Commissioner's position or the analysis in Historic Boardwalk suggests that the two analyses can only take place together, or that a bona fide partnership cannot engage in a transaction that § 707 recognizes as a disguised sale between a partnership and its partner. To the extent that its analysis is persuasive authority, Historic Boardwalk stands for the unremarkable principle that in certain instances, factors relevant to the one of these inquiries may overlap with factors relevant to the other.

17

entity or its members. Instead, as contemplated by § 707(a), this case turns on the nature of the <u>transaction</u> at issue: the exchange of Virginia tax credits for money.[9]

Turning to the specific circumstances of Virginia Conservation and Route 231's transaction, we first determine whether the Virginia tax credits constitute "property" within the scope of I.R.C. § 707 (regulating the "transfer of money or other property"). We agree with the Tax Court's analysis and its conclusion that the Virginia tax credits are "property" for purposes of I.R.C. § 707. The tax credits' status as "property" is evidenced by their value as an inducement to Virginia Conservation to join Route 231. It bears noting that Virginia Conservation was paying fifty-three cents on the dollar for a credit worth a full dollar in tax relief from Virginia state income tax: a transaction of real economic value. Moreover, Route 231's ownership of the Virginia tax credits gave rise to such essential proprietary rights as the right to own or use an item, to exclude others from ownership, and the right to

_____

[9] Nor did <u>Virginia Historic</u> limit § 707(a)'s scope to non-developer partnerships as Route 231 contends. To be sure, in examining the transaction at issue in Virginia Historic, we pointed out that our holding that the tax credits were property arose in the factual context of a "non-developer partnership," and that tax credits may not categorically constitute "property." But this language simply recognizes the factual setting of <u>Virginia Historic</u> and reflects the requisite analysis of "property" must be made in each case and not taken as a per se rule.

18

transfer them as permitted under state law.  In addition, as we explained in greater detail in <u>Virginia Historic</u>, treating the tax credits as "property" is consistent "with Congress's intent to widen [§ 707's] reach" when that statute was amended in 1984. <u>See</u> 639 F.3d at 142.

Having determined that the Virginia tax credits constitute "property," we turn to whether the transfer of this property from Route 231 to Virginia Conservation constituted a "sale." Because the exchange of tax credits for money occurred within a two-year period, the presumption that the transaction is a disguised sale arises unless the "facts and circumstances clearly establish" otherwise.  <u>See</u> 26 C.F.R. § 1.707-3(c)(1). The regulations provide that transactions of this nature are in fact sales if, "based on all the facts and circumstances," (1) the transfer of money would not have been made without the transfer of property, and (2) the subsequent transfer was not dependent on the entrepreneurial risks of the partnership.  26 C.F.R. § 1.707-3(b)(1).

The analysis of these two considerations is based on the totality of the "facts and circumstances," including the ten potentially applicable factors noted earlier.  26 C.F.R. § 1.707-3(b)(2).  As the Tax Court noted, among the items that "tend to prove the existence of a sale" in this case are:

19

- the fixed cash-to-credit ratio for the transaction as set out in the amended operating agreements, coupled with Route 231's agreement to earn those tax credits by December 31, 2005 (cf. 26 C.F.R. § 1.707-3(b)(2)(i); Va. Historic, 639 F.3d at 143);
- Virginia Conservation's contractual right under the amended operating agreement to all but Carr's share of the tax credits Route 231 earned (cf. 26 C.F.R. § 1.707-3(b)(2)(ii); Va. Historic, 639 F.3d at 143);
- Virginia Conservation's right to be indemnified by Route 231, Carr, and Humiston should it not receive all the tax credits for which it provided Route 231 money (cf. 26 C.F.R. § 1.707-3(b)(2)(iii); Va. Historic, 639 F.3d at 143-44)[10];
- Carr's agreement to reduce the amount of tax credits he would receive so that Route 231 could transfer to Virginia Conservation the full amount of tax credits for which it had contracted and paid (cf. 26 C.F.R. § 1.707-3(b)(2)(v));
- That Virginia Conservation received a 1% interest in the LLC and yet received 97% of Route 231's state tax credits for the "contribution" of $3,816,000 while Carr and Humiston each received a 50% (later reduced

---

[10] We reject Route 231's argument that the amended operating agreements' indemnity clause should not serve as proof that Virginia Conservation's right to the tax credits or their value was secured. Route 231 contends that the indemnity clause did not "fully protect [it] from partnership risks" because Route 231, Carr, and Humiston had minimal available assets should any one of them have been required to pay Virginia Conservation in satisfaction of the indemnity obligation. That argument misunderstands the relevant factor, which is whether "the partner's right to receive the transfer of money or other consideration is secured in any manner[.]" 26 C.F.R. § 1.707-3(b)(2)(iii). The regulation only asks whether the secured right exists, not whether there is a risk that the secured party may not in fact be able to collect on a judgment for breach of contract at some point in time. Because the indemnity clause creates a legally enforceable right of indemnity, the Tax Court appropriately concluded that this factor weighed in favor of a disguised sale.

to 49.5%) interest in the partnership and yet received 3% and 0% of Route 231's conservation tax credits for their "contributions" of $2,300,000 (cf. 26 C.F.R. § 1.707-3(b)(2)(ix); Va. Historic, 639 F.3d at 144); and

- That Virginia Conservation had no obligation to return or repay the tax credits to Route 231, but exercised full ownership rights in them (cf. 26 C.F.R. § 1.707-3(b)(2)(x); Va. Historic, 639 F.3d at 144).

These facts and circumstances form the basis for our conclusion that the Tax Court correctly determined that this transaction was a sale under 26 C.F.R. § 1.707-3(b)(1). Viewing all the circumstances surrounding this transaction, and in particular the terms of the amended operating agreements, the Tax Court did not err in finding that "Route 231 would not have transferred $7,200,000 of Virginia tax credits to Virginia Conservation but for the fact that Virginia Conservation had transferred $3,816,000 to it" and vice versa. J.A. 1526; cf. 26 C.F.R. § 1.707-3(b)(1)(i).

Moreover, Virginia Conservation's right to the tax credits did not depend on the entrepreneurial risks of Route 231's operations. Cf. 26 C.F.R. § 1.707-3(b)(1)(ii). Arguing to the contrary, Route 231 points to Virginia Conservation's assuming certain entrepreneurial risks as a partner in an ongoing partnership, but 26 C.F.R. § 1.707-3(b)(1)(ii) focuses on whether the later of the two transfers depended on the entrepreneurial risks of Route 231. Here, the plain language of

21

the amended operating agreements created a fixed cash-to-credit ratio to determine what each party would exchange. They also contained a specific guarantee that Virginia Conservation would receive all of the tax credits it paid for and that it would be entitled to reimbursement in cash for any shortfall. At bottom, Virginia Conservation's right to the tax credits depended on fixed contractual terms, not the entrepreneurial risks of Route 231's operations.

For these reasons, our review of the record leads us to the firm belief that Route 231 failed to rebut the presumption that the transaction between Route 231 and Virginia Conservation was a sale. Cf. 26 C.F.R. § 1.707-3(c) (creating a presumption that transfers made within two years are presumed to be a sale "unless the facts and circumstances clearly establish" otherwise). Accordingly, we hold that the Tax Court did not err in agreeing with the Commissioner that the money Route 231 received from Virginia Conservation was "income" for federal tax purposes.

## B. Applicable Tax Year

Route 231 contends that even if the funds it received from Virginia Conservation should have been reported as "income," that income was reportable in 2006 rather than 2005. If Route 231 is correct, then the determination that the Virginia tax credit transfer constituted "income" would have no impact on it

22

because the IRS did not seek an adjustment of Route 231's 2006 tax return on that ground and any change to that tax year is now barred by the statute of limitations. See I.R.C. § 6229 (articulating the limitations period for making assessments).

As we discuss below, we find none of Route 231's arguments on the applicable tax year to be meritorious. The Tax Court correctly determined that the tax credit sale occurred in 2005 for federal tax purposes.[11]

1.

As an initial matter, Route 231 remains bound by its affirmative representation on its 2005 federal tax form that it received $3,816,000 from Virginia Conservation in 2005. That factual representation to the Commissioner sets the parameters of the legal dispute between the Commissioner and Route 231: given that this transaction occurred, how does the Internal Revenue Code characterize it?

We have previously recognized with approval the Fifth Circuit's decision in Wichita Coca Cola Bottling Co. v. United States, 152 F.2d 6 (5th Cir. 1945), where the court recognized that a "duty of consistency in tax accounting" does not require

---

[11] Route 231 also raises evidentiary challenges to some of the exhibits the Tax Court relied upon in concluding the sale occurred in 2005. Because other independent evidence fully supports the Tax Court's conclusion, it is unnecessary to address those arguments. See 28 U.S.C. § 2111.

23

a "willful misrepresentation" to be proven, nor does it require "all the elements of a technical estoppel. It arises rather from the duty of disclosure which the law puts on the taxpayer, along with the duty of handling his accounting so it will fairly subject his income to taxation." Id. at 8, relied on favorably in Interlochen Co. v. Comm'r, 232 F.2d 873, 877-78 (4th Cir. 1956). Thus, in Wichita Coca Cola Bottling Co., the Fifth Circuit concluded that if a taxpayer mistakenly "represented a transaction as to defer taxation on it to a later year he ought not, when the time for taxation under his view of it comes, to be allowed to assert the tax ought to have been levied in the former year if it is then too late so to levy it." 152 F.2d at 8.

The same basic principle applies here. Through its 2005 tax return, Route 231 represented to the IRS that the events constituting the transaction occurred in 2005. Upon proof that the reported tax credit transaction is properly characterized as a disguised sale and thus taxable as income, Route 231 cannot then be allowed to assert the transaction occurred in a different year than it represented, given that it is too late to require Route 231 to report it as income in the later year, 2006.

The bottom-line principle remains constant: A taxpayer may be barred from taking one factual position in a tax return and

24

then taking an inconsistent position later in a court proceeding in an effort to avoid liability based on the altered tax consequences of the original position. E.g., Janis v. Comm'r, 461 F.3d 1080, 1085 (9th Cir. 2006) ("'[T]he duty of consistency not only reflects basic fairness, but also shows a proper regard for the administration of justice and the dignity of the law. The law should not be such a[n] idiot that it cannot prevent a taxpayer from changing the historical facts from year to year in order to escape a fair share of the burdens of maintaining our government. Our tax system depends upon self assessment and honesty, rather than upon hiding of the pea or forgetful [equivocation].'" (quoting Estate of Ashman v. Comm'r, 231 F.3d 541, 544 (9th Cir. 2000))); Alamo Nat'l Bank v. Comm'r, 95 F.2d 622, 623 (5th Cir. 1938) ("It is no more right to allow a party to blow hot and cold as suits his interests in tax matters than in other relationships. Whether it be called estoppel, or a duty of consistency, or the fixing of a fact by agreement, the fact fixed for one year ought to remain fixed in all its consequences, unless a more just general settlement is proposed and can be effected."). Accordingly, the Tax Court did not err in concluding Route 231 remained bound by its original factual

representation that the transfer of funds from Virginia Conservation occurred in 2005.[12]

2.

Quite apart from the equitable consistency consideration, we also conclude that the record demonstrates the sale of Virginia tax credits in fact occurred in 2005. In particular, the record supports the Tax Court's determination that Route 231 transferred to Virginia Conservation before January 1, 2006 the

---

[12] Route 231 urges that the duty of consistency should not apply because, among other things, the IRS could have, and yet did not, challenge Route 231's 2006 return in light of its position with respect to Route 231's 2005 return. As such, it contends the Commissioner is responsible for its inability to adjust the 2006 return. In addition, it contends the Commissioner's position in this case is inconsistent with its position in Virginia Historic, where adjustments were proposed to two years of tax returns based on the argument that the challenged transactions constituted sales and where the Commissioner agreed that any adjustments should be made to the second year's returns.

This argument overlooks key factual differences between this case and Virginia Historic. There, the partnership engaged in multiple transactions with partners that occurred "between November 2001 and April 2002." 639 F.3d at 135. The Commissioner challenged the partnership's tax returns for both 2001 and 2002 because the transactions at issue occurred in both tax years. Furthermore, the Commissioner stipulated that any adjustments for all of the transactions should apply to the partnership's 2002 tax returns. Id. at 136. That stipulation has no bearing on the Commissioner's position in this case and even less on the appropriate analysis. Here, in contrast, the Commissioner only challenged one transaction. The Commissioner appropriately challenged Route 231's characterization of that transaction for the tax year where Route 231 reported the transaction as having occurred. Far from being inconsistent positions, the Commissioner has taken its position based on the facts of the cases before it.

26

tax credits that it had earned because of the December 30 conservation donation.

Under the then-applicable Virginia statute, Va. Code § 58.1-512 (2005), Route 231 earned tax credits as a matter of law as soon as it made a qualifying conservation donation. The statute set out – among other things – the value of the tax credits ("50% of the fair market value"), what type of donation qualified, and how the fair market value of the donation was to be substantiated. See Va. Code § 58.1-512 (2005). As the Tax Court observed, this statutory language was later amended to add language requiring taxpayers to "apply for a credit" that would then be "issued" by the Virginia Department of Taxation. Va. Code § 58.1-512(D)-(E) (2007). But that amended language was not the law of Virginia in 2005.

Based on the applicable Virginia statutory language, Route 231 earned the tax credits by making the statutorily compliant donation on December 30, 2005. Notably, Route 231 does not contend that it had failed to meet any of the Virginia statutory requirements, and it only speculates that the Virginia Department of Taxation might have decreased the anticipated number of earned tax credits despite having satisfied those requirements. The point remains, under the applicable state

27

statutes, Route 231 earned – and therefore owned – tax credits as of the time of its donation, which occurred in 2005.[13]

The record also shows that Route 231 transferred all but Carr's share of those tax credits to Virginia Conservation in 2005. Under 26 C.F.R. § 1.707-3(a)(2), a

> sale is considered to take place on the date that, under general principles of Federal tax law, the partnership is considered the owner of the property. If the transfer . . . from the partnership to the partner occurs after the transfer . . . . to the partnership[,] the partner and the partnership are treated as if, on the date of the sale, the partnership transferred to the partner an obligation to transfer to the partner[.]

As noted earlier, a corollary principle applies when the transfer from the partner occurs after the transfer from the partnership. See 26 C.F.R. § 1.707-6(a).

Under federal tax law, an entity "owns" property when it possesses the benefits and burdens of ownership. The Tax Court appropriately applied a multi-factor analysis to determine whether Route 231 owned the tax credits in 2005. The relevant

---

[13] Route 231's argument that while it might have been able to use the tax credits immediately, it could not transfer the credits without registering them misreads the applicable Virginia statute. Va. Code § 58.1-513(C) (2005) allowed the transfer of "unused but otherwise allowable credit for use by another taxpayer on Virginia income tax returns" without reservation. While that statute required taxpayers to file a notification of the transfer with the Virginia Department of Taxation, nothing in the statute required that the notification occur prior to the transfer of tax credits. See Va. Code § 58.1-513(C) (2005).

28

factors in that analysis include: whether legal title passed; how the parties treated the transaction; whether an equity interest in the property was acquired; whether the contract created a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; whether the right of possession was vested in the purchasers; which party bore the risk of loss or damage to the property; and which party received profits from the operation and sale of the property. Calloway v. Comm'r, 691 F.3d 1315, 1327-28 (11th Cir. 2012); Arevalo v. Comm'r, 469 F.3d 436, 439 (5th Cir. 2006); Crooks v. Comm'r, 453 F.3d 653, 656 (6th Cir. 2006); Upham v. Comm'r, 923 F.2d 1328, 1334 (8th Cir. 1991). No one of these factors controls, as the determination of ownership is based on all the facts and circumstances of a particular case, and some factors may be "ill-suited or irrelevant" to a particular case. Calloway, 691 F.3d at 1327.

Under the totality of the relevant circumstances here, the Tax Court correctly determined that the sale occurred in 2005. We already discussed Route 231's representation on its 2005 federal tax forms, but that is just one of several instances where Route 231 treated or represented the transfer as occurring in 2005. Route 231's Forms LPC represented to the Virginia Department of Taxation that the tax credits had been transferred to Virginia Conservation in December 2005. In addition, the

29

first amended operating agreement (signed on December 28) created a present contractual obligation for Route 231 to convey to Virginia Conservation all but $300,000 of any tax credits Route 231 earned from a conservation donation before December 31, 2005. Thus, as soon as Route 231 earned the tax credits by recording the statutory-compliant conservation donation on December 30, 2005, Virginia Conservation had the legal right to those credits.

As further support for our conclusion, the language used in Route 231's second amended agreement (signed January 1, 2006) recited the salient sale events as having occurred in the past, not as prospective acts. For example, that agreement refers to Virginia Conservation as having "made" its contribution, Route 231 as having "duly earned" the tax credits, and those credits having "been allocated" to Carr and Virginia Conservation, respectively. (J.A. 504, 508, 517.) Lastly, in additional correspondence between Route 231, Virginia Conservation, and the escrow agent, Route 231 specifically recognized the potential tax consequences of the transaction occurring in 2005 versus 2006, and maintained that it occurred in 2005. Consistent with that view, when a concern arose as to who bore the risk of loss and owned any interest earned while the funds were held in escrow, Route 231 and Virginia Conservation agreed that Route 231 bore that risk and would also be entitled to any interest

30

earned. During those discussions, Route 231 affirmed that Virginia Conservation's payment of the funds into escrow (in December 2005) "satisfied [its] contractual obligation to contribute to the capital of Route 231." (J.A. 608.)

To recap, Virginia Conservation had legal title, an equity interest in, and the right to possess the tax credits as soon as Route 231 earned them in 2005; Route 231, Virginia Conservation, and other parties to the transaction all intended for the transaction to occur, and treated the transaction as having occurred, in 2005 throughout the negotiations up until the Commissioner challenged how Route 231 characterized the transfer on its federal tax return; and the first amended operating agreement gave rise to a present obligation on the part of Route 231 to transfer the tax credits earned in 2005, while the second amended operating agreement documented that this obligation had been satisfied. All of these circumstances demonstrate that the sale occurred in 2005.

Route 231 argues that this analysis ignores the language of the escrow agreements and the fact that Virginia Conservation did not authorize release of the funds from escrow until March 2006, after it confirmed receiving various documents related to the conservation donation and the Virginia tax credit transaction numbers. To the contrary, the above analysis takes the totality of circumstances into consideration rather than

31

focusing on the escrow agreements apart from the whole. This conclusion also finds support in the language of the escrow agreements, which provide that only two events automatically required the escrow agent to return the funds to Virginia Conservation and thus cancelled the sale: failure to record the charitable donations "on or before December 31, 2005" or failure to admit Virginia Conservation as a Route 231 partner "on or before December 31, 2005." (J.A. 532, 536, 540.) Both those events were known and satisfied before the end of 2005, so the escrow agreements' contingency could not have occurred in 2006.

The remaining acts Route 231 points to as showing a sale of tax credits did not occur in 2005 – that it provide Virginia Conservation copies of certain documents relating to the conservation donation and the tax credits, and that Virginia Conservation provide written confirmation of receiving them – are of no consequence. These acts are ministerial, not substantive. The escrow agreements only speak to Route 231 providing copies of documents and are not directly contingent on the outcome of the Virginia Department of Taxation's review process. Providing copies is a quintessential ministerial task. See Black's Law Dictionary 1011 (defining "ministerial" as "[o]f or relating to an act that involves obedience to instructions or laws instead of discretion, judgment, or skill"); see also Ray v. United States, 301 U.S. 158, 163 (1937). In the unlikely

32

event that the Virginia Department of Taxation reduced the amount of tax credits Virginia Conservation would receive, the amended operating agreements (not the escrow agreements) directed how Virginia Conservation would be compensated. Moreover, it would have no bearing on the fact that Route 231 sold a portion of its earned tax credits to Virginia Conservation in 2005. That is to say, it would not impact the fact of the sale.

Based on the totality of the evidence, the sale of tax credits for money occurred in 2005, and all that remained in 2006 were ministerial formalities.

3.

Route 231's argument fails for a third reason: it uses the accrual method of accounting, and under the principles applicable to the accrual method, the sale occurred in 2005. Gross income must be "included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period." I.R.C. § 451(a). "Under an accrual method of accounting, income is includible in gross income when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy." 26 C.F.R. § 1.451-1(a). Generally speaking, this

33

means that "income . . . is taxable in the year the income is accrued, or earned, even if it is not received in that year." IES Indus., Inc. v. United States, 253 F.3d 350, 357 (8th Cir. 2001). Although we do not have any published authority elaborating on what "all the events" means for purposes of applying this regulation, the Tax Court adopted a reasonable interpretation that other cases have used: (1) the required performance takes place, (2) the payment is due, or (3) the payment is made, whichever comes first. Johnson v. Comm'r, 108 T.C. 448, 459 (1997), rev'd in part on other grounds, 184 F.3d 786 (8th Cir. 1999).

Here, Route 231 earned Virginia Conservation's $3,816,000 payment with reasonable certainty in 2005 when it made the conservation donations that gave rise to the Virginia tax credits. Under the terms of the amended operating agreements, that act was sufficient to obligate Route 231 to transfer all but Carr's share of the tax credits to Virginia Conservation. And, in turn, that occurrence was sufficient to obligate Virginia Conservation to pay Route 231 the pre-determined cash-to-credit ratio for the tax credits. Consequently, by December 31, 2005, "all the events [had] occurred which fix[ed] the right to receive [Virginia Conservation's money] and the amount thereof c[ould] be determined with reasonable accuracy." Cf. 26 C.F.R. § 1.451-1(a). Accordingly, the Tax Court correctly

34

determined that under the accrual method of accounting, Route 231 was obligated to report the $3,816,000 in income from Virginia Conservation on its 2005 federal tax forms.

## III.

For the reasons set out above, we affirm the Tax Court's decision adjusting Route 231's 2005 Return of Partnership Income federal tax form to reflect, in relevant part, income of $3,816,000.

AFFIRMED